### VARICK vs. SMITH AND THE ATTORNEY GENERAL.

Where a patent from the state for lands adjoining a navigable river, above tide water, refers for the location of the lot to a map on file in the surveyor general's office, upon which map the lot is laid down as bounded on the river generally, the patentee is entitled to hold to the middle of the stream; subject to the right of the public to navigate the river in such parts of it as are navigable. And subject to such right of the public, the patentee is entitled to the use of the water and water privileges naturally connected with the lot thus granted.

Lots bounding upon a river above tide water, and immediately below a state dam erected for the use of a canal belonging to the state, were sold by the commissioners of the land office as water lots bounding upon the river generally; *Held*, that the purchaser of such water lots was entitled to the water privileges connected with such lots at the time of the sale, by the natural flow of the surplus water over the state dam, so far as such waters could be used, to the middle of the stream, without interfering with the public right of navigation; and that the state officers could not afterwards lease such surplus waters, and authorize the lessee to prevent them from flowing over the dam, *to the injury of the water privileges connected with the water lots thus sold.*

1842.

Varick
v.
Smith.

April 19.

THIS was an appeal by the defendants from a decree of the vice chancellor of the fifth circuit. The facts of the case as stated in the complainant's bill are set out in the report of the decision of the chancellor upon the appeal from the order of the former vice chancellor overruling the demurrer of the defendant Smith. (5 *Paige's Rep.* 137, *S. C.*) After the decision upon that appeal the defendants answered the bill, denying the complainant's title to the water privileges claimed by him below the state dam, and also denying that he had any right to the lands in the bed of the Oswego river. A replication was filed to the answers, and the cause was heard upon pleadings and proofs. The vice chancellor decided that the complainant had established his title to the water privileges claimed by him, and to the lands on the west side of the river at and below the state dam to the middle of the stream. He therefore decreed the lease to be void, so far as it purported to grant to the lessees or their assigns the right to draw from the state dam the surplus waters not wanted for the canal, and thereby to prevent the same from flowing to the complainant's mills and property below; and granted a perpetual injunction against using such surplus waters by taking the same from or through the state dam.

The following opinion was delivered by the vice chancellor upon making the decree appealed from.

GRIDLEY, V. C. The report of this case, (5 *Paige's Rep.* 138,) where it came before the chancellor upon an appeal from a decretal order of the late vice chancellor of this circuit, overruling a demurrer to the bill of complaint, contains a very full and accurate statement of the facts as they are set forth in the bill. The answers of the attorney general, and of the defendant Smith, and the proofs taken in the cause, have in some respects changed the facts assumed as true upon the demurrer; and those changes will be adverted to in the course of this opinion, whenever

they become material to the decision of any of the points raised in the cause.

The first question discussed by the respective counsel, and which I propose to consider, is whether the complainant in the character of riparian proprietor, is to be regarded as the owner of the bed of the Oswego river to the middle of the stream adjacent to his possessions described in the bill. This question was distinctly passed upon by the late vice chancellor, and by the chancellor upon the appeal; and as I had supposed, was put at rest by their decisions, so that it was no longer an open question before this tribunal. It is now, however, contended, that the decision of the court of errors, in the case of *The Canal Appraisers* v. *The People, ex rel. Tibbits*, (17 *Wend. Rep.* 571,) and certain remarks of the chancellor himself made in the course of his opinion in that case, and some new facts given in evidence by the defendants, have thrown doubt on this question and upon this point. The counsel for the defendants now insists, 1. That the complainant is restricted from all right to the bed of the stream by the wording of the grants under which he, and those from whom he derives title, claim. 2. That the Oswego river being a navigable river, its bed belongs to the people of the state.

Upon the first of these propositions, there is no doubt but that the description in a deed of conveyance may be so worded as to exclude the right of the grantee from any portion of the bed of a stream. And the chancellor, while commenting upon cases thus circumstanced, in pronouncing his opinion in the case of *The Canal Appraisers* v. *The People*, (17 *Wendell*, 599,) remarks : " In many cases also, the grants upon the borders of navigable streams have been so limited as to confine the patentees to the bank of the stream, by the plain terms of the patent itself. Such is the case, as I understand the testimony of the late surveyor general, in relation to all the grants for military bounty lands which lie upon the borders of navigable rivers. He says, the patent itself only contains the number of the lot ; but that the survey and field notes in his

office contain a particular description of the boundaries; that where such lots are situated on the banks of navigable rivers, they are bounded on the banks of such rivers or streams, and run thence along the *bank* of such stream. This is a clear indication of the intention of such grantors that the patent should not include any part of the *alveus* of the stream, or of the islands therein." It is true, that the premises of the complainant described in the bill, except the block purchased of the state, are a portion of lot No. 7 in Hannibal, granted to John Allen, by letters patent, bearing date the 7th day of July, 1790, as military bounty lands. An exemplification of the patent, and the map referred to in the description of the premises allotted, have been produced in evidence, in which the land granted is described as " All that certain tract or lot of land situate, lying and being in the county of Montgomery, and in the township of Hannibal, known and distinguished on a map of said township, filed by our surveyor general in our secretary's office agreeable to law, by lot No. 7, containing six hundred acres," and upon the accompanying map, the lot No. 7 is laid down and delineated as lying adjacent and extending *to* the Oswego river; which, in the absence of any other evidence, must be taken as though the premises were described by words in the grant itself, as extending to, and bounded on the river. So far, therefore as the description in the original grant is material to be considered, it must be regarded as conveying, by the settled construction of the term used in the patent, the land under the water to the thread of the stream. But in some of the mesne conveyances under which the complainant holds, the description of the premises is a little varied. As to *one* piece, the boundary line is described as extending " to the westerly bank of the Oswego river; then along said river and the bank thereof north, fifty-two degrees west three chains, thence along said river as aforesaid," &c. In the description of the other piece the boundary line is stated to extend " to the west bank of the Oswego river, at low water mark; thence along the wind-

1842.

Varick
v.
Smith.

ings of said river at low water mark to the place of beginning." It is said in *Hatch* v. *Dwight*, (17 *Mass. Rep.* 289,) that where land is bounded on the bank of a stream, such description excludes the bed of the stream. That remark, as applied to the facts of that case, was clearly founded in truth. The facts of the case were such, as to indicate with great certainty, that by the use of the phraseology employed the parties intended to exclude from the operation of the release the bed of the stream. But I do not think that this is the necessary construction of such descriptive words in a grant. The popular understanding of them would doubtless limit the grant to the land adjacent to the stream. And so would the popular understanding of a description which bounded the premises upon the margin of a stream, or on the stream itself; but the legal construction of such words contained in the description of premises in a grant, has by repeated adjudications been established otherwise. (*See* 6 *Cowen*, 518, *and Mr. Cowen's note to that case with the authorities therein cited.*) The grantors, however, in the language employed to describe the complainant's premises, as extracted from the mesne conveyances under which he holds, use the phrase bank of the river as synonymous with the river itself, carrying the boundary line *to* the bank, and then along the " river" and not along the " bank of the river," and to the west bank at low water mark and " thence along the windings of said river." There is nothing, therefore, in the particular words employed to describe the extent of the complainant's premises, which indicates an intention to restrict the boundaries of the grant, otherwise than if the premises had been bounded on the river, or on the margin of the river. Nor is there any fact disclosed by the evidence, showing the least reason for believing that the parties who employed the words of the description above cited, intended to secure to themselves the right to the bed of the stream : on the contrary they clearly intended to part with their whole interest. Such a state of facts, however, did appear in the case of *Hatch* v.

*Dwight,* before cited, and without doubt had a controlling influence upon the decision of the court. The blocks described in the bill of complaint, are situated on lot No. 1, in Hannibal, which had been reserved by the state; and the title of the complainant to these blocks is derived from the state by purchase. These blocks are described in the certificate of sale in the patent subsequently granted to the complainant, as " blocks number 78, 90, 99 and 103, of the village of West Oswego, &c., as the same have been surveyed, and are designated on the map of said village, filed in the office of the secretary of our said state." An exemplified copy of said map has been given in evidence which exhibits these blocks as adjoining the river ; which I consider as equivalent to a description which in terms should describe them as bounded upon the river. What then was the extent of the premises thus granted by the state ? In the terms of sale, and in the terms employed in the patent, a phraseology has been adopted, which, as between private individuals, would convey an interest to the middle of the river. And is the doctrine to be tolerated which shall assign one construction to a contract between private citizens, and a different one between an individual and the government ? Would not the adoption of such a rule of construction operate as a fraud upon a purchaser who should pay an enhanced price for land adjacent to a stream of water upon the faith of a contract, which, as between private individuals, would have given him valuable hydraulic privileges ? It seems to me that but one answer can be given to these questions. I therefore cannot resist the conclusion, that there is nothing in the circumstances attending these grants from the state, and nothing in the words of description employed in such grants, or in the circumstances attending the mesne conveyances, which can properly restrict the riparian rights of the complainant, and prevent him from holding to the thread of the stream.

The next question is, whether the Oswego river is a navigable river in such a sense as to prevent the application to it of the principle of riparian ownership ; and whether

there is evidence before the court, which shows an original and continued appropriation of the bed of the river to the public.

1842.

Varick
v.
Smith.

In discussing this question it must be borne in mind, that the doctrine of riparian ownership does not give a right to the bed of the stream, and the use of the water incompatible with the superior rights of the public, for the purposes of navigation and commerce. It acknowledges the right of eminent domain existing in the government, and only insists that the riparian owner has such a qualified and subordinate right to the bed of the stream, and the water which flows over it, as is consistent with the conceded rights of the public. (*See the 3d chapter of the first part of Hale's treatise De Jure Maris.*)

With this explanation of what is meant by the right of a riparian proprietor to the bed of a river capable of being used for the purpose of navigation, we are prepared to enquire whether this doctrine is applicable to the Oswego river. It cannot be a controverted question, that at common law the Oswego river would be subject to this right. Lord Hale says : " Fresh rivers of what kind soever, do of common right belong to the owner of the soil adjacent ; so that the owners of the one side have of common right the property of the soil, and consequently the right of fishing *usque ad filum aquæ.*" He elsewhere defines what is meant by *navigable or public rivers* in the absolute sense of the term, and denominates only those such, which are arms of the sea where the sea flows and reflows. The distinction is also recognized and illustrated in *Palmer* v. *Mulligan*, (3 *Caines*, 318, 319,) where many English authorities are collected, which show that the Wey, the Severn and the Thames, are subject to the right of riparian ownership, above the points where the tide ebbs and flows, though they are navigable by boats, &c. and are subject to the servitude of the public for the purposes of navigation and commerce. In the case of *Palmer* v. *Mulligan*, this doctrine is applied to the Hudson river at Stillwater ; which in the language of Ch. J. Kent, "is a fresh river, not naviga-

ble in the common law sense of the term, for the tide does not ebb and flow at that place."

This doctrine has since been sanctioned and confirmed by repeated decisions in this state, and in most of the other states of the union, and applied to streams which were navigable for boats and rafts which had been declared to be public highways by statute.   The doctrine thus established as an elementary principle of the common law, and thus sustained by an unbroken series of adjudications in England and this state, is still the law of the land, and has not been overthrown, as has been urged on the argument, by the decision of the court of errors, in the case of *The Canal Appraisers* v. *The People*, (17 *Wend.* 572.)   It is true, the counsel in that case contended that this common law doctrine was not applicable at all in this state ; and that if it were applicable to small streams that it was not to the large class of rivers.   Nevertheless, the decision, as I shall have occasion to show hereafter, does not necessarily repudiate this doctrine, and of course leaves it as the authoritative rule of adjudication which it is the duty of all inferior tribunals to try.

The next question is, whether the statutes of the state have changed the common law doctrine of riparian ownership in relation to the Oswego river.   It is insisted by the defendants' counsel, that the court of errors have decided that the various acts of the legislature in relation to the Mohawk river, and the repeated legislative assertions of ownership of the bed of that stream, are evidence, that the state was the owner of the bed of that river.   And hence he argues, that the same kind of evidence being furnished, in this suit in regard to the Oswego river, calls for the application of the same principle to that stream. It is proper, therefore, to consider how far that case is binding as an authority.   It is undoubtedly binding, not only as to the point actually decided in the case, but as to all the legal principles which are necessary grounds for that decision. In point of fact, a particular judgment of the supreme court was reversed ; and as we cannot know the reasons

which influenced the votes of the majority of the court, further than as they are to be found in the views of the senators who pronounced opinions in favor of such reversal, we are naturally led to examine these opinions. Senators Beardsley and Tracy delivered the prevailing opinions. And in page 605, senator Beardsley maintained that the evidence in the case showed that the relator was entitled to only a certain portion of the damages to his waterfall, even on the principles assumed by the supreme court, in relation to the right of the relator as riparian owner, and that the judgment of the supreme court should be reversed for that reason alone. He next argues against the application of the doctrine in question to the Mohawk river, but adds that " he has doubts of the correctness of the views which he had adopted. And on page 613, he disclaims any general application of that doctrine to other rivers, in the following words : " Nor do I now, in any further remarks that I may make on that subject, intend to express an opinion that shall be considered binding in reference to other rivers, where grants have been made by the government, particularly since the revolution." And again he says, " I hold myself uncommitted should other cases arise in reference to other rivers." So too, senator Tracy maintains, in page 624, that it is not necessary to discard the application of the common law doctrine of riparian ownership to the Mohawk river in order to warrant a reversal of the judgment of the supreme court. I apprehend, then, that in a case where the reversal of the judgment of the supreme court was placed on grounds entirely consistent with the long established principles of riparian ownership, by the only judges who expressed opinions upon the question, it would be unsafe to conclude that those who gave a silent vote for the reversal acted upon principles hostile to that doctrine. They may have done so or they may not. It is sufficient, that the adoption of such principles was not deemed necessary to a reversal, by the judges who advocated that decision. If we reject this case as an authority controlling the decision of the case at bar, we are left to an unrestricted ex-

amination of the grounds relied on to show an original appropriation of the bed of the Oswego river by the state. In support of this proposition the counsel refers to the act passed for establishing the land office and other purposes; (1 *Greenl. ed. Laws*, *p.* 284 ;) which provided that the commissioners should be authorized to grant so much of the land under the navigable rivers as they should deem necessary to promote the commerce of the state, with the proviso that no such grant should be made to other than the owner of the adjacent lands.

I cannot think that the legislature intended by this provision to declare that the doctrine of riparian ownership was inapplicable to rivers which were navigable in the most extended sense of the term. The common law interpretation of the term navigable had been long settled. It had received a construction by adjudication, and when applied to a river, it meant a river where the tide ebbed and flowed and by the principles of the common law the bed of such a stream belonged to the state. (3 *Caines*, 318.) The legislature then should be deemed to use the term in a legal sense when they are applying it to create or describe a legal right. In that sense the law would violate no existing principle of private right; whereas, by adopting the construction claimed by the defendant, it would seriously infringe the established common law rights of the citizen. It is also to be remembered, that this provision has existed since a very early period of the government ; and it does not appear that, in the practical construction of it, the commissioners of the land office have ever conveyed any lands in the bed of any of the rivers of the state which were not navigable in the common law sense of the term. Again, the claim on the part of the state is wholly inconsistent with the doctrine advanced in the case of *Palmer* v. *Mulligan*, and several subsequent cases, wherein the doctrine of riparian ownership was held to apply to streams which were navigable in the same sense that the Oswego river is navigable.

The defendant has given in evidence several patents of

islands in the Seneca and Oswego rivers granted by the state; and has referred me to pages 359th and 360th of the 13th vol. of Wendell's Reports, which, though not strictly evidence in the case, serve to show historically that the state authorities have granted other islands in the same streams. In my judgment the chancellor has satisfactorily answered the argument founded on such grants, in his learned opinion in the case of *The Canal Appraisers* v. *The People*, (17 *Wend.* 599, 600.) But it would seem to be enough that the most strenuous advocates for the right of the state to the bed of navigable streams, senators Beardley and Tracy, with this very evidence before them, took the precaution to repel by unequivocal language the application of the principle contended for in the case before cited, to any other river than the Mohawk; and expressly reserving their judgments as to all other cases. (17 *Wend. Rep.* 613.)

On the other hand the patent to John Allen, and the patent to the complainant granting the blocks in West Oswego, convey the premises thus granted by such words of description as, by the established construction of such language in grants between private citizens, carry the title to the bed of the river. In addition to this the complainant has given in evidence an exemplified copy of letters patent to George Scriba of a large tract of land bordering upon the Oswego river, issued in 1794, in which the descriptive words are of similar import. Now when these patents were granted the state owned the lands adjacent, and by consequence the bed of the stream itself. The state officers advertise and sell these lands thus bordering on the stream of water, which lands are mainly valuable for hydraulic privileges, but nearly worthless provided these patents do not convey the land under the water and the use of the water flowing over it. The purchaser buys them with reference to the value of such hydraulic privileges. The proper agents of the state convey the premises by patent, which as to its form and requisites passes the supervision of the law-officer of the government; and which by settled

legal construction conveys the bed of the stream, and the water flowing over it. Can it then be asserted, with any semblance of justice, that the state is not estopped from claiming the bed of the stream thus conveyed ? Can the state convey valuable hydraulic privileges by words which under the law of the state have received a settled interpretation, and then claim an exemption from the legal effect of such construction ? Is not a contract between the government and an individual to be construed by the same rules as a contract between private citizens ? Would not a departure from the settled construction of the words of a grant, when the state happens to be grantor, operate as a fraud upon a purchaser who made the contract with reference to its ordinary interpretation, and who paid his money relying on the soundness of his contract and the good faith of the government ? It seems to me, that, according to all just principles, whether of morals or of law, the government is bound by its contract according to its settled legal interpretation ; and that the state, by the terms of its own grant is estopped from denying the complainant's title to the bed of the Oswego river, and to the use of the water flowing over it, adjacent to the premises described in the bill of complainant.

In the language of the court in the case *Ex parte Jennings*, (6 *Cowen*, 528,) " If the state had intended to retain the property in the stream, they should have inserted an express reservation or exception in their grant." The way is now prepared for the inquiry how far the rights of the complainant as riparian proprietor, and of those under whom he claims, have been affected by the erection of the state dam in the Oswego river. It appears by the evidence that in 1824 or 1825, the canal commissioners caused the state dam to be erected, across the Oswego river, for the purpose of raising a supply of water for the Oswego canal, constructed on the east side of that river ; that a body of water is elevated some 10 or 12 feet high by this dam, and that a large surplus of water passes over the dam, which of course is not necessary and cannot be used for the sup-

ply of the canal. The complainant owns the land both above and below the dam, and opposite to the dam where it is connected with the west bank of the river. At the time when the state dam was erected, the blocks described in the bill belonged to the state ; the piece of land first described in the bill was then owned by the heirs of Daniel Burt, and was valuable for its hydraulic privileges ; and the piece secondly above described then belonged to James Burt, and was not valuable for such privileges.

The defendant's counsel insist, that all the land covered by the dam and by the water therein, and the land upon which the water falls, must be regarded as having been appropriated by and as now belonging to the state ; and that as the complainant purchased after the erection of the dam, he never obtained any interest in the land so appropriated. This proposition involves a most important and interesting question in relation to the relative rights of the state and private citizens. It is an incontrovertible proposition, that the government has no power to take the private property of a citizen, except for public use. Such was the doctrine of the civil law, and such has ever been held to be the doctrine of the common law, both in England and in this state. (*See* 2 *Kent's Com.* 339, 340 ; 2 *John. Ch. R.* 166, 167 ; 1 *Black. Com.* 138, 139 ; 3 *Dall. Rep.* 194, 235 ; 3 *Story's Com. on the Const.* 661.) The constitutions of the United States and of this state have placed a further safeguard around the principle of private right, and have provided that private property shall not be taken for public use without just compensation. No statute law, therefore, which clothes the agents of the state with powers inconsistent with these great constitutional principles, is valid ; and no act of the canal commissioners, in conflict with these principles, whether sanctioned by an act of the legislature or not, has any binding force. The powers of the commissioners, as to the appropriation of land and property in the construction of the Oswego canal, were the same with those conferred by the act, entitled " An act respecting navigable communications between the great western and

1842.

Varick
v.
Smith.

northern lakes and the Atlantic ocean. (*Laws of* 1817, *p.* 300.) By the third section of that act, the commissioners were authorized " to enter upon, take possession of and use all and singular any lands, waters and streams necessary for the prosecution of the improvements intended by the act," &c. and to make all such canals, feeders, dykes, locks, dams and other works and devices as they might think proper for making said improvements, doing nevertheless no unnecessary damage. What then, under the provisions of this act, in the case under consideration, was taken and appropriated to the public use ? Clearly all the land and water which were necessary for the improvement which the commissioners were then prosecuting. In other words, they took all the land and water necessary for the furnishing of an adequate supply of water for the Oswego canal. Was the water accumulated in that dam, from the moment it passed over the top of the dam and in its descent to the bed of the stream below the dam, necessary for the supply of the Oswego canal ? On the contrary, the moment it commenced its descent it was incapable of beng appropriated to that purpose, and it had ceased to be consecrated to the public use. It had become physically impossible to appropriate it to such use. The public property in it had ceased to exist ; and in my judgment, the right of the riparian owner, which had been suspended, revived and reattached to it in full force, subject to no restriction, except that servitude to public interest, for the general purposes of navigation, which existed before the erection of the dam. It was necessary, for the purpose of divesting a portion of the waters of the Oswego river to the Oswego canal, to raise a large accumulation of water in the dam, and much more than could be diverted for the use of the canal. And as this dam was erected by the state, it became public property, so that no person possessed the right of drawing off any portion of the accumulated water, through the dam itself, by inserting a flume and gate in it ; for that would involve a trespass upon the property of the state. This consideration, however, does not

affect the right of the riparian owner to the water after its escape over the dam. That depends solely on the right of the state to appropriate the property of a citizen to any other purpose than public use. That is a right which does not exist, and cannot lawfully be enforced either with or without a provision for compensation. The government has the power, under the constitution, to appropriate the private property of its citizens, just so far and no farther than is necessary for the purpose and object of the appropriation ; and that may be an absolute and exclusive right to land or water, or it may be a partial or common or usufructuary right, according to the nature of the property and the circumstances of the case. But when such purpose is accomplished, the right of the state is exhausted, and the whole of the residue of the property, whatever it may be, belongs to the citizen. In this particular case, the state has the absolute and exclusive right to the land on which the dam is built, and to the dam itself. It has also an absolute and exclusive right to so much water as is necessary to be diverted for the supply of the Oswego canal, and by necessary consequence it has a temporary and usufructuary right to all the water in the dam, as a means of keeping an adequate supply for actual diversion. And it has a partial right to the land on which the water flows ; that is, a right to have the water fall upon it. The state, therefore, may lawfully appropriate the property of the individual owner to this extent, by making proper provision for compensation for the damages sustained. Beyond this, I apprehend the power of the government does not extend ; and all right to the property, or to the use of it, which is not thus appropriated, may be enjoyed by the original owner of it or by his grantees. Of course, the complainant in this cause has a right, notwithstanding the objections arising from the alleged appropriation by the state, to use the water in its descent from the dam, and to use his hydraulic privileges below the dam, although he may raise the water at the foot of the dam, provided he does not injure the dam erected for public use.

The question now arises whether the lease of the surplus waters, set out in the bill as being held by the defendant Smith, is in conflict with the right of the complainant as above declared. This must depend on the true construction of that instrument. By it, the canal commissioners assumed to grant and lease to the original lessee, all the surplus waters which, without injury to the navigation or security of the canal, might be spared from the Oswego canal, to be taken and drawn from the west wing of the first dam above Oswego, including one half of the surplus waters on said dam, in such place and in such manner as the said canal commissioners should from time to time deem meet and advisable for the security of the canal, and for the convenience of the navigation thereof.

If the principles which have been already advanced are well founded, then the person owning the land adjacent to the state dam at the time of the execution of the lease was then entitled, and the complainant having succeeded to his rights, is now entitled, to have the surplus waters flow over the state dam, and to use them in their descent to the bed of the stream, if he can do so without injury to the navigation of the river. This right is utterly inconsistent with the right granted by the very terms of the lease. By these terms the lessees are authorized to draw off all the surplus waters on the west wing of the dam. These waters cannot be taken and drawn from the west wing of the dam without destroying the complainant's right to them in their descent over the dam; and in granting this lease, my opinion is that the canal commissioners exceeded their authority. It will be perceived that the ground on which I have placed this decision will render it unnecessary to examine several questions, which were discussed by the counsel, relating to the complainant's alleged rights under certain statutes, providing for the disposing of the right to use the surplus waters, to those who had before the erection of the the state dam possessed hydraulic privileges theretofore used, and also to persons owning the land adjoining any dams that might be erected. It will also be seen that I

have assumed that the complainant must so use this surplus water as not to injure the owners on the east side of the river (though it is shown that one of the wing dams did so) and without creating a public nuisance in the river. But it is proper to add, that whether that be so or not, is not an inquiry which can be drawn in question in this collateral way. (3 *Caines' Rep.* 315. 7 *Cowen*, 266.) If the above opinion is a correct exposition of the rights of these parties, it gives the complainant the right to valuable hydraulic privileges, adjacent to his premises adjoining the Oswego river, which would otherwise be comparatively useless; and it will readily be seen therefore, that this lease, which by its very terms destroys the complainant's right to these privileges, constitutes what the law denominates a cloud upon his title to them. Although the lease is invalid, it nevertheless brings the complainant's right to these privileges doubly in dispute, and essentially impairs the value of his property in them. It is obvious that purchasers would be far less likely to purchase mill sites of the complainant, with this cloud hanging over the right to use the waters in their descent from the dam; and especially under a pending notice from the defendant, that he shall, under the right conferred by this lease, claim an accounting and reimbursement for the use of such waters. It is unnecessary to cite cases to show that this is a proper and fit case for the exercise of the jurisdiction of the court of chancery. The decree will therefore declare the rights of the complainant in accordance with the principles above advanced, and will declare the lease void so far as it assumes to convey the right to draw the surplus waters from the dam, thus preventing or diverting them from their descent to the stream below; and it will also enjoin the defendant from thus drawing or diverting said waters.

This, however, is not a case where costs should be awarded against the defendant Smith. He has merely asserted a right under a lease executed by the agents of the state, under a belief entertained in good faith that such lease was valid. The original lessees paid the state a valuable consideration

for the privileges granted by the lease, and the defendant Smith has paid a fair consideration for the assignment of it to himself. Under such a state of facts, it would be a severe exercise of the discretion vested in the court in relation to the subject of costs, to award them against a bona fide purchaser of rights granted by the state, under the sanction of its officers who believed they were acting under the authority of the law.

*D. Cady & The Attorney General,* for the appellants. The respondent does not now and never has owned the bed of the Oswego river on which the west half of the state dam mentioned in the bill was built. The Oswego river is not mentioned in the patent. The lot is granted as described or distinguished on a map of said township filed by the surveyor general in the secretary's office according to law. The map excludes the river as effectually as any words in the grant could do. If the Oswego river and its bed be regarded as having been private property at the time the state dam was erected, the land on which the dam stands and upon which the water falls from the dam, must be deemed to have been appropriated by, and as now belonging to the state in fee, and as the complainant purchased after such appropriation was made he never has had any interest or estate in the land so appropriated. The Oswego river is a navigable river and the commissioners of the canal office had no power to grant its bed except in the manner provided for by law. (1 *Greenl. Laws N. Y.*, 284, *ch.* 37, § 18. 1 *R. L. of* 1802, *p.* 293, § 11. *Idem of* 1813, *p.* 293, § 1.) By the statute laws of 1819, (*ch.* 199, § 1,) the power is extended to land under the water of navigable lakes. To show that the legislature have regarded the Oswego as a navigable river, see *Laws of* 1820, *p.* 105, *ch.* 117, § 7; *Idem of* 1824, *p.* 279, *ch.* 342, §§ 1, 2; *Idem of* 1812, *p.* 442, § 6. The lease is a valid contract, and if it be not the respondent has no such interest in the surplus water mentioned in the lease as entitled him to file a bill in this court to set aside the lease. If the

lease be set aside there is no statute which will entitle the respondent to the use of the surplus water. The respondent cannot have the right to intercept the water in its descent from the dam because it is then over the land belonging to the state and must be the property of the state. The respondent cannot use the water in its descent from the dam for any hydraulic purpose, unless he builds mills immediately below the dam upon the bed of the river, and this he cannot do, without an act of the legislature authorizing it to be done, because the Oswego river is a public highway. Although the principal object in building dams across the Oswego river, was to improve the navigation of that river, yet the legislature, when water is raised in a dam belonging to the state, have the same right to control its use as well for hydraulic purposes as for the purposes of navigation. And the legislature have the same constitutional power to cause dams to be erected across large streams of water for the purpose of creating hydraulic privileges, as for the purpose of navigation. Should a dam erected for the sole purpose of creating hydraulic privileges, very much improve the navigation above the dam, the legislature would have a right to compel any person to pay toll who should use the same for the purpose of navigation.

The decree in effect although not in terms establishes the respondent's title to the bed of the Oswego river notwithstanding that river is a public highway, and the respondent's right and title has not been established at law. (*Mitf. Pl.* 129, 147, 148.)

*J. A. Spencer & C. A. Mann*, for the respondent. Grants of land bounded on rivers and streams above tide water (and of course upon the Oswego river,) extend to the centre or thread of the stream. The terms of the several grants set forth in the bill of complaint are such as to bound the land of the complainant upon the margin of the river, and therefore upon the principle last stated to extend his title to the centre of the river. The act of 1798, declaring the Oswego river a public highway does not impair the complainant's individual rights, but only renders

them subject to an easement in favor of the public for the purposes of navigation. The lease of which the defendant is assignee is void, because its effect is to take the property of one citizen and transfer it to another, which can be done neither with or without compensation. The complainant's right is sufficiently clear to entitle him to relief without a trial at law. By the law of this state, as it always has been and yet is, the complainant, as riparian owner is seized of the bed of the Oswego river and of a right to the use of the water to the centre of the river opposite to his land described in the bill. The canal commissioners in the prosecution of the improvements of the Oswego river were authorized to take for the use of the public only such lands and water as were necessary for the purposes of navigation, and the surplus remains to the original owner to be used in any manner not inconsistent with the public rights of navigation. The canal commissioners had not by law, any right to put the complainant, or those under whom he claims, in such a situation as to deprive them of the power to avail themselves of the benefit of the provisions of the act entitled, "An act for the relief of the owners of hydraulic privileges in cases where dams are erected by canal commissioners," passed April 5, 1823, (*Laws of 1823, p.* 132,) but the lease in question, if valid, would have the effect so to deprive them, and it is for that reason void. The lease in question was issued contrary to the provisions of the statute, authorizing the leasing of surplus waters. The west half of the Oswego river not constituting any part of the Oswego canal, the canal commissioners possessed no power under tne statute, to lease the water mentioned in the bill, and the lease for this reason is void. Whenever the canal commissioners construct a dam across a river to divert a portion of the stream for the purpose of the public use, they do not thereby acquire a title to the whole water of the stream : but if in so erecting a dam they improve the hydraulic power of an individual, that individual is entitled to use the same in its improved state in any manner not inconsistent with public navigation and without rendering any compensation therefor to the state.

1842.

Varick
v.
Smith.

THE CHANCELLOR. This court having, in a former stage of the suit, determined that the bill in this case was properly filed if the facts stated therein were true, the complainant was entitled to a decree protecting his right to the water privileges claimed by him, and to the use of the waters which would naturally flow over the state dam on the west side of the river, which were not wanted for the use of the canal, if he succeeded in showing a title to the *alveus* or bed of the stream on that side ; subject to the public right of navigation, so far as it is navigable. And without taking time to follow the vice chancellor in his able and elaborate opinion upon the question of title, I concur in the conclusion at which he arrived, that the complainant succeeded in establishing his title, substantially as stated in his bill.

The patent from the state for lot No. seven, under which the complainant has derived his title to the lands adjoining the dam and for some distance below the same, by legal construction conveys the *alveus* or bed of the river to the centre of the stream, where it meets the lands granted by the Scriba patent on the east side of the river. The patent for No. 7 refers for its location to the map of the township of Hannibal filed in the surveyor general's office. And upon that map the lot is bounded generally on the Oswego or Onondaga river on the east. It is the same, therefore, as if the patent had in terms bounded the lands granted by the river, without restriction or limitation ; which would legally have carried the grant to the centre of the stream, subject to the right of the public to navigate the stream in those parts thereof, if any, in which it was navigable. The patent from the state to Varick, for blocks 78, 90, 99 and 103 in West Oswego, also refers in the same manner to a map filed in the office of the secretary of state ; which map bounds these blocks on the river without restriction. And the complainant under that grant was therefore entitled to the water and water privileges which were naturally connected with those water lots. It may also be proper to observe that by the surveyor gen-

eral's certificate, it appears that these blocks were sold to Varick & Turrill in July, 1827, and that the sale of the surplus waters in the dam did not take place until the next month. If the waters which were not wanted for the use of the public, and which naturally flowed over the dam and down the original channel of the river, therefore, were of any benefit to the owner of these water lots, or could be used by such owner without interfering with the public right of navigation, the complainant obtained the prior right by virtue of such purchase. For these reasons, and those which were given when the case was before me upon demurrer, I think the decree appealed from, so far as respects the rights of the complainant, was not erroneous ; and the same must be affirmed with costs.

But upon the argument, the attorney general and the counsel for Mr. Smith, consented that the decree should be so modified as to be without prejudice to the right of the state and of Smith, as between themselves. It must therefore be modified accordingly in that respect. The decree upon this appeal to be entered as of the 6th of February, 1840, nunc pro tunc.