THE PEOPLE, *ex rel.* ARPHAXED LOOMIS, Appellants, *v.* THE CANAL APPRAISERS, Respondents.

The Mohawk river is a navigable stream; and the title to the bed of the river is in the people of the State.

Riparian owners along the stream are not entitled to damages for any diversion or use of the waters of the Mohawk by the State.

*It seems,* that the common law rules, determining what streams are navigable, are not applicable in this country.

The subject of navigable streams elaborately and learnedly discussed, per DAVIES, J.

*F. Kernan,* for the appellants.

*R. Earl,* for the respondents.

DAVIES, J.   This is a proceeding by mandamus to compel the canal appraisers to assess and appraise the damages which the relator has sustained by the use and diversion of the waters of the Mohawk river, at Little Falls, for the purposes of the Erie canal.   It is assumed, and may be taken as conceded, that the Mohawk river is one of the navigable rivers of this State, and, perhaps, the court may take judicial notice of the fact that it is so.   On the 30th of March, 1792, the legislature of this State incorporated a company to be known thereafter as " The President, Directors and Company of the Western Inland Lock Navigation in the State of New York," for the purpose of opening a lock navigation from the then navigable part of Hudson's river to be extended to Lake Ontario and to the Seneca lake.   This act was amended by another passed on the 22d of December, 1792 (Greenl. Laws, vol. 3, p. 13), the fifth section of which declared that all the land under the water in the Mohawk river, which may be required by the said corporation for the purpose of constructing any canal lock, dyke, embankment or dam for the improvement of the navigation thereof, shall be and hereby is vested in the said corporation and its successors, as a free gift from the people of this State, saving and reserving to the people of this State the right to all lands under the

water not so occupied as aforesaid, to be appropriated as the legislature shall from time to time direct.

The facts agreed upon between the parties are, that about the year 1798, the said Western Inland Lock Navigation Company constructed a canal, with locks, around the falls of the river at Little Falls, under power and right vested in that corporation by this charter and other statutes, and continued to use the water of the river at that place for the purpose of feeding the said canal and locks until the sale to the State.

That about the year 1823, the State purchased and became the proprietors of the canal and works of the Western Inland Lock Navigation Company at Little Falls. That the State, about the year 1823, constructed an aqueduct across the river at Little Falls, and by means of it diverted the water from the canal of the Inland Lock Navigation Company into the Erie canal, and paid no damages to any other party therefor, except the appraised value of the property and franchise of the said Western Inland Lock Navigation Company; and that the Erie canal continued to be supplied with water at Little Falls drawn through that old channel unenlarged, and across the river until the period of the enlargement of the Erie canal. That about the year 1841, in the enlargement of the Erie canal, a feeder was constructed on the south side of the river at Little Falls, through which water has since been drawn to supply the enlarged canal and locks with water; that since the year 1841, the State has caused the water to be drawn from the Mohawk river through both of the said feeders, and has, by means of said last constructed feeder, greatly increased the quantity of water drawn from the river at Little Falls into the Erie canal, to wit, at the rate of about 12,000 cubit feet per minute. That all the water so diverted from the river is taken from the same level, above the head of the falls, and not returned to the river, and the owners of the lands bounded on said river, are thereby deprived of the use of the same. That the relator was the owner in fee of the land adjoining the river on the south side thereof at the time of the diversion and appropri-

ation in 1841, aforesaid, and at the time of the service of the claim for damages claimed herein. That the relator's title came to him by sundry mesne conveyances from a patent granted to the Herkimers and their heirs and assigns forever, in which the boundary on the river is described as follows: "Thence north 60. degrees west to the said Mohawk river; thence down the stream thereof as it runs to the place where the tract began." The relator acquired his title to said premises, and the water of the river flowing in the channel thereof, by deed in fee from one Bellinger, in February, 1829. Said Bellinger was in possession, claiming as owner under the patent aforesaid, for many years prior thereto, and had used the water of the Mohawk river under claim of right as riparian owner of lot No. 16 in said patent, of which lot the premises conveyed by him to the relator, were part and parcel, to propel a grist mill erected by him about the year 1801, which mill was still in existence, operated by said water at the time of said diversion in 1841, and the grant of part of said lot No. 16 to the relator was bounded by the middle of the river, and the relator had used the water of the river under claim of right as the riparian owner from a short time after said conveyance ·to him, till after said diversion and claim in 1841. That the water power of the river had been used to propel one or more mills by the riparian owners on the north shore of the river, during the revolutionary war, and has so continued to be used under claim of right and title until the present time. That the value of the property of the relator,· of which the river is the boundary, consists largely in the facilities for the use of the water power of the river on his land, which water has a fall of over 20 feet thereon, and such value is greatly impaired by reason of said diversion of the water above his lands from the channel of the river into the Erie canal, by means of the feeder finished in 1841, and the appropriation thereof by the State for the Erie canal enlargement; that the above mentioned diversion and appropriation were made without the consent of the said claimant, and no compensation has been made by the State to him therefor, and his damages

therefor have never been appraised. That the relator had made the claim for damages, and that the canal appraisers had refused to award the same.

That the ground of such refusal to award such damages, was that the Mohawk river at Little Falls was the property of the State.

This claim is founded on the assumption that the Mohawk river is one of the navigable rivers of the State, and consequently the State is the owner of the bed thereof, and of the waters that flow therein. The Special Term awarded a writ of mandamus, but on appeal, the General Term reversed the judgment, and the relator now appeals to this court.

The title to the land or bed of the river undeniably carried with it the water that flowed over it. The relator's claim to the water of the Mohawk river is based upon the fact, as alleged by him, that he is the owner of the bed of the river, *usqum ad medium filae,* by virtue of the grant set forth in the writ. His boundary extending to the said river, and thence down the stream thereof, would necessarily carry him to the thread of the stream, unless the river be of that character which constitutes the State the owner of the bed thereof, and it is a significant fact, and one worthy of particular observation, that as early as the year 1792, the State thus regarded itself the owner, and granted a portion of the bed of the river to the Western Inland Navigation Company, for the uses and purposes of said company, and this grant carried with it the water flowing over the same. Such grant was made to that company " as a free gift from the people of this State," and the act making the same saved and reserved to the people of this State, the lands under water not so occupied, " to be appropriated as the legislature should from time to time direct." This grant and reservation were an early and emphatic assertion of ownership on the part of the people of this State, of the land and waters of the Mohawk river. At the time of the passage of this act, the senate was composed of 24 members, among whom was Samuel Jones, an eminent lawyer of that day, and Generals Gansevoort, Schuyler and Van Rensselaer, of Albany, and the assembly of 66

members, and among the latter were John Watts and Josiah Ogden Hoffman, of New York, James Kent, of Dutchess, and Stephen Lush, of Albany, all eminent lawyers.

The bill was objected to by the council of revision, at a meeting thereof held on the first of December, 1792, at which were present Governor George Clinton, Chancellor Livingston and Messrs. Hobart and Lansing, justices of the Supreme Court. The objections of the council are found in Street's New York Council of Revision, page 299, and an examination of them will show that the council did not object to the grant or reservation contained in the fifth section of the act. Their attention must necessarily have been called to these provisions, and their silence in regard to them conveys their unqualified approval of them. Notwithstanding the objections of the council, the bill received, in its reconsideration by the legislature, its almost unanimous approval, having but one negative vote in the senate, and an almost equal unanimity in the house. In alluding to these facts, a distinguished member of the Court of Errors, in his opinion in the case of *The Canal Appraisers* v. *The People* (17 Wend., 610), very correctly and pertinently observed, "Then it is evident that the bill underwent a most rigid scrutiny, not only in the council of revision, but in each branch of the legislature, and yet no one objected to it as violating private rights, in granting such parts of the beds of the Mohawk and Hudson as were necessary, and in asserting the rights of the State to the residue. On looking at the names of those who then composed the council of revision, and of those who composed the legislature, it will be found that many of our most distinguished citizens and soundest lawyers were among them ; men who not only knew the law but who would be the last to violate it or sport with private rights. * * * In reference to this legislature, it is worthy of remark, that here was brought to bear the scrutiny and solemn deliberation of the three great branches of the government, the executive, judicial and legislative, upon the precise point of ownership of the beds of the two rivers, and it resulted in the declaration of ownership in the State."

Again, at a very early period in the history of this State, the legislature organized a board, designated and known as the commissioners of the land office, to which was committed the care and custody of all lands owned by the State, and by which, as directed by the legislature from time to time, grants thereof have been made. This board was created by an act passed on the 5th of May, 1786, and the 18th section of the act declared that it should and might be lawful for the said commissioners to grant such and so much of the lands under the water of navigable rivers as they should deem necessary to promote the commerce of this State, provided always that no such grant should be made in pursuance of this act to any person whatever other than the proprietor or proprietors of the adjacent lands. (1 Greenl. Laws, p. 280.) This power conferred upon the commissioners in relation to grants of land under the waters of navigable rivers, was contained in the Revision of 1813, in the same language. (1 R. L., p. 293, § 4.) On the 14th of April, 1815, the legislature passed an act, by which the powers of the commissioners to make grants of land under water were extended "to the lands under water on navigable lakes." (Laws of 1815, ch. 199, p. 201.) In the Revision of the Laws of 1830, the commissioners are declared "to have power to grant so much of lands under the waters of navigable rivers or lakes as they shall deem necessary to promote the commerce of this State." (1 R. S., p. 208, § 67.) By an act passed in 1850 (Laws of 1850, ch. 283, p. 621), this section of the Revised Statutes was amended so as to read as follows: "The commissioners of the land office shall have power to grant in perpetuity or otherwise so much of the lands under the waters of navigable rivers or lakes as they shall deem necessary to promote the commerce of this State, or proper for the purpose of beneficial enjoyment of the same by the adjacent owner, but no such grant shall be made to any person other than the proprietor of the adjacent lands, and any such grant that shall be made to any other person shall be void." And such is the present authority on this subject vested in the commissioners of the land office. (1 R. S., 5th ed., p. 552, § 82.)

Although the commissioners of the land office are restricted in grants made by them of lands under water in navigable rivers or lakes to the proprietor of the adjacent lands, yet there is no such restraint upon the powers of the State, as exercised through the legislature. It is lawful for the State to make the grant to others than the adjacent proprietor. (*Gould* v. *Hudson River R. R. Co.*, 2 Seld., 522.)

In this connection, it is not unimportant to notice other legislation by this State, indicating its control over the waters of this State. As early as the year 1802, an act was passed declaring the waters of certain streams, therein mentioned, to be public highways, but containing permission to the owners of adjoining lands to make erections on said waters, so that the same shall not obstruct the navigation thereof. (3 Webs., 144.) Numerous acts of a similar character are found in our statute books, containing restrictions upon the use of the streams declared to be public highways, and of the waters thereof.

It may be proper here to advert to the declaration of the people of this State, in the Revised Statutes, that the people thereof, in their rights of sovereignty, are deemed to possess the original and ultimate property in all lands within the jurisdiction of the State. (3 R. S., 5th ed., p. 2, § 1; *The People* v. *Denison*, 17 Wend., 313; *The People* v. *Van Rensselaer*, 5 Seld., 291; *De Peyester* v. *Michael*, 2 Seld., 467, 510; *Wadsworth* v. *Buffalo Hydraulic Association* 15 Barb., 83.)

Upon the separation of the colonies from the crown of Great Britain, the people of this State succeeded to all the rights of the British crown to lands within its territorial jurisdiction, and *prima facie* being the owners of the lands covered by the waters of the Mohawk river, they can use those waters for any purpose. It is contended, on the part of the relator, that the patentees, under whom he claims, by virtue of their patent, acquired the title to the center of the river, and consequently to the use of its waters. It is claimed by the relator that, by the common law, which, it is contended, is applicable in this State, under a grant of land, situate

upon a fresh water river, the grantee takes title to the thread of the stream, and has the right to use the land and water thereof in any way. And it is said, if the stream be fresh and navigable, the same rights accrue and exist to the use of the land and water, in any way not inconsistent with the use of the stream for navigation.

It is undoubtedly true that such parts of the common law as were in force on the 20th day of April, 1777, were adopted by the people of this State as the laws thereof, subject to such alterations as the legislature should make concerning the same. But such declaration does not compel us blindly and slavishly to incorporate into our system of jurisprudence principles totally inapplicable to our circumstances and condition, and which would produce absurd results. I think we shall find in an investigation of this subject, that the remarks of Judge JOHNSON in *Brown* v. *Scofield* (8 Barb., 239), are eminently sound and pertinent : " The common law of England, upon this subject, from its utter want of fitness and adaptation to the condition of things here, in an extended territory, with its numerous inland lakes and countless streams, capable of floating the products of the country hundreds and thousands of miles from the ebb and flow of tide water, has never been adopted, or if adopted it has been in a form modified and improved to fit the condition of the country and the wants of its inhabitants."

The fountain from which all of the rules on the subject now under consideration has been drawn, is the celebrated treatise *de jure maris* by Lord Chief Justice HALE. Judge COWEN, in his learned note to the case of *Ex parte Jennings* (6 Cowen, 556), seems to think that the extravagant encomium of Mr. Wirt, in reference to this author, that "with a mind beaming with the effulgence of noonday he sat on the bench like a descended god," was almost justified. Judge COWEN says of this work " that his doctrines are so full, his distinctions so clear, and his illustrations so striking and apposite, that they seem to deserve an insertion in our books." I desire to express no dissent from these deserved commendations, if I have correctly apprehended the doctrines advanced

by this eminent writer.    A careful examination of his text and the authorities referred to have led my mind to the conviction that much misapprehension has existed as to what doctrine he actually promulgated.

Chapter first treats concerning the interest of fresh rivers. He says: "Fresh rivers, of what kind soever, do of common right belong to the owners of the soil adjacent, so that the owners of the one side have of common right the propriety of the soil, and consequently the right of fishing, *usque filum aquae;* and the owners of the other side the right of soil or ownership and fishing unto the *filum aquae* on their side. And if a man be owner of the land of both sides, in common presumption he is the owner of the whole river, and hath the right of fishing according to the extent of his land in length." Now it is particularly to be observed that nothing is said here about rivers navigable; but these remarks are confined to "fresh rivers."    And chapter two is entitled, of the king's prerogative in private or fresh rivers; and in this chapter it is said that the king hath jurisdiction to reform and punish nuisances in all rivers, whether fresh or salt; that they are a common passage, not only for ships or greater vessels, but also for smaller, as barges or boats, and hath power to reform the obstructions therein, so that these kinds of rivers, whether fresh or salt, that bear boats or barges, are highways by water, whether the soil be the king's or not.    In chapter third it is declared that the king has the right of property in the sea, and in the shore thereof, and in what is called an arm of the sea, where the sea flows and reflows, and so far only as the sea so flows and reflows; and that, although the water be fresh at high water, yet the denomination of an arm of the sea continues, if it flow and reflow.

But in the celebrated and leading case of *The Royal Fishery of the River Banne,* it was resolved that there are two kinds of rivers, navigable and not navigable.    Every navigable river, so high as the sea flows and ebbs in it, is a royal river, and the fishery therein a royal fishery, but in every other river not navigable, and in the fishery of such river, the tertenants on each side have an interest of common right.

And in the statute of 28 Henry VIII, ch. 22, the rivers Barrow, Noire and Soire are called the king's rivers, and the weirs erected in them are called purprestures, and it was said that although the king permitted his people for their ease and commodity to have common passage over such navigable rivers, yet he hath a sole interest in the soil of such rivers. Wherefore it was resolved in that case that the river Banne, so far as the sea flows and ebbs in it, is a royal river, and that the fishery therein belongs to the king and not to those who have the soil on each side of the water. But on the other part it was agreed that every inland river not navigable appertains to the owners of the soil whereon it hath its course, and if such river runneth between two manors, and is the boundary between them, the one moiety of the river and fishery belongeth to one lord, and the other moiety to the other. (Sir John Davies' Rep., 149.) This case was decided in 8 James I, about the year 1610. It should be noted that in this case but two kinds of rivers are spoken of, navigable and not navigable, and it is expressly ruled that the soil or property in the latter belongs to the tertenants on each side, and inferentially, as to the navigable rivers, that the property therein is in the king. This is expressly ruled as to such parts of the same in which the sea flows and ebbs. And it being held that the king hath the soil in the Barrow, Noire and Soire, navigable rivers, it would follow that he also owned the soil in all navigable rivers, whether the sea did or not flow and ebb. For those three rivers are not tidal rivers. The Barrow, or Barragh, is a river of Ireland, which rises in the Slievebloom mountains, and, after a course of about ninety miles south, joins the Soire, to form the estuary of Waterford harbor. The Noire is an affluent of the Barrow.

In *Warren* v. *Mathews* (6 Mod., 73), Lord HOLT, Ch. J., held that every subject of common right might fish with lawful nets, &c., in a navigable river, as well as in the sea. (*S. C.*, 1 Salk., 357.) This was held of the River Exe, a river of England, which rises in Exmoor, Somerset county, and after a course of 45 miles flows into the English channel at Exemouth. It is thus seen that a navigable river is placed

on the same footing as the sea. In *Carter* v. *Murcott* (4 Burr., 2162), Lord MANSFIELD said, in rivers *not* navigable, the proprietors of the land have the right of fishery on their respective sides, and it generally extends *ad filum medium aquae.* But in navigable rivers, the proprietors of the land on each side have it not, the fishery is common; it is *prima facie* in the king, and is public. Justice YATES says, the cases cited prove only this distinction, "that navigable rivers or arms of the sea, belong to the crown, and not, like private rivers, to the land owners on each side." He says the case of *The Fishery in the Banne* is agreeable to this, and 'tis a very good case. Lord MANSFIELD, afterwards, in 1774, keeping in mind this same distinction, repeats the same doctrine. In *The Mayor of Lynn* v. *Turner* (Cowp., 86), he says, "*Ex facto oritur jus.* How does it appear that this is a navigable river? The flowing and reflowing of the tide does not make it so; for there are many places into which the tide flows that are not navigable rivers." The case of *Warren* v. *Mathews* was approved of by WILLES, Ch. J., in Willes' Rep., 265, 268.

In *The King* v. *Smith* (Doug., 441), the question submitted to the court was, "whether (this being a navigable river) the right to the soil in the bed of the river *usque ad filum aquae,* is in the owners of the ground adjoining to the river?" On the part of the defense, it was urged that the right of the crown to the soil was only in navigable rivers as far as the sea ebbs and flows, and that in the Thames, the sea did not properly flow above London bridge. Judgment was given on the verdict against the defendants. Lord MANSFIELD said the case did not state whether the water, when the tide rises at Richmond, is fresh or salt, but that it rather took it for granted that it is salt, describing the Thames generally as a navigable river. In *Miles* v. *Rose* (5 Term, 705), GROSE, Ch. J., said, the flowing of the tide, though not absolutely inconsistent with a right of private property in the creek, is strong *prima facie* evidence of its being a public navigable river; and HEATH, J., observed that the flux and reflux of the tide is strong *prima facie* evidence that this.

was a navigable river.   While it must be conceded that
Hale, in his treatise, regards it as essential to a navigable
river that it should have the ebb and flow of the tide, and
ceases to be navigable, in this sense, when or at the point
when it is uninfluenced by the tide, yet it cannot be denied
that such has not been the opinion of all the English judges
in all cases.   Lord MANSFIELD correctly said "*Ex facto oritur
jus,*" and it seems more rational to determine the question
of navigability or unnavigability from the fact of navigation,
or otherwise, than from a circumstance which may or may
not be conclusive evidence of its navigability.   The flow and
reflow of the tide is *prima facie* evidence, as has been said,
of the fact that the river is navigable, but the real and sub-
stantial inquiry must always be to ascertain whether the
river is navigable or not.   When this main and controlling
fact is established, then we have means of determining
whether the *alveus* or bed of the river, is the property of
the adjoining owners or belongs to the State, or the people
represented by it.   That is the substantial question in con-
troversy in this action, and to its proper settlement, we must
ascertain what is the law of this State applicable to its
solution.

It will now be convenient to examine the decisions of and
the discussions in the courts of this State upon this topic.
The action of the legislature of 1792, in appropriating to the
uses of corporations the bed of the Mohawk river, and that of
the Hudson, above tidal influences, seems not to have attracted
attention until a late day.   Such legislation could only be
defended and justified on the theory that the State was the
owner of the *alveus* or bed of those streams, and such was
undoubtedly assumed to be the fact, and it was based on
the ground that they were navigable rivers.   *Palmer* v.
*Mulligan* (3 Caines, 307) was an action on the case for dam-
ages which the plaintiffs claimed to have sustained to their
mill and dam, by the erection by the defendants of another
mill above theirs, and thus diverting the water.   At the *locus
in quo,* there was neither flux or reflux of the tide, and
Emott, the counsel for plaintiffs, contended that it had been

decided in the case of *The Fishery of the Banne*, that there are two kinds of rivers, navigable and not navigable, the former extending as high as the sea ebbs and flows, and belonging to the king, and the latter being such when the sea does not ebb or flow, and belonging to the landholders on each side, and he contended that consequently the river changed its character at the point where the tide ceased to ebb and flow, and although in fact it was navigable above that point, it ceased to be a navigable river in the sense which made it belong to the king.  SPENCER, J., said, "Has not the legislature granted islands above the site of these mills, and by that shown that they consider the Hudson to be a public river?"   The counsel for defendants contended that the Hudson, at the point in controversy, was a public river, it seeming to be conceded on both sides if it was, then the bed thereof belonged to the State.   A verdict was had for defendants, and the Supreme Court refused to set it aside. In the opinion of the majority of the court, but a single allusion is made to the question now under discussion, and that was by SPENCER; J., who said, "It is conceded that the plaintiffs and defendants respectively own the lands on the bank of the river opposite their mills and dams.   Whether the Hudson river be considered as a public highway, or the bed of it as belonging to the owners of the adjacent shores, would not vary the result."   THOMPSON, J., who dissented from the judgment, was of opinion that as the tide did not ebb and flow as high up the Hudson river as the point in question, the land under the water was as much the subject of a private grant as the land adjoining the river, subject to be used for public purposes.   Chief Justice KENT also dissented, and held that the Hudson, at the point in question, was a fresh river, *not navigable* in the common law sense of the term, for the tide does not ebb and flow at that place.   *Shaw* v. *Crawford* (10 Johns., 246), was an action for obstructing the Battenkill, a stream in Washington county, and which had been used for thirty-six years previous for rafting.   The defendants moved for a nonsuit on the ground that the stream was not a public highway, and the court said that according

to the authority of Sir MATHEW HALE, cited in *Palmer* v. *Mulligan* (*supra*), a river not navigable in the common law sense of the term, though the fee of it belongs to the owners of the adjoining banks, may be still liable to the public uses of rafting and boat navigation as a public highway, and the court held that the user had been for a sufficient length of time to grow into a public right. *The People* v. *Platt* (17 Johns., 195) was an indictment against the defendant for obstructing the river Saranac, in this State. It is a rough, rapid and shallow stream, and is not navigable for any kind of boats or craft. The defendant owned the land on both sides of the river, and the question was as to his right to make and continue the dam. SPENCER, Ch. J., said that he was satisfied that the defendant has a complete and exclusive ownership of the Saranac from its confluence with the lake, it being a conceded fact that the river is unnavigable for boats of any kind.

In the case of *Hooker* v. *Cummings* (20 Johns., 90), the defendant was prosecuted for taking salmon in Salmon river, from the close of the plaintiff. The defendant, in his plea, alleged that Salmon river is a public and common navigable river, into which the sea or lake called Lake Ontario flows and reflows. To this plea a demurrer was interposed; and it was contended, in support of the demurrer, that where the river is wholly fresh, it is wholly private property. And the Supreme Court held that the principles of the common law had been recognized in *Platt's Case* (*supra*); that, in the case of a private river, that is, when it is a fresh water river, in which the tide does not ebb and flow, and is not, therefore, an arm of the sea, he who owns the soil has, *prima facie,* the right of fishing; and if the soil on both sides be owned by an individual, he has the sole and exclusive right; but if there are different proprietors on each side, they own, on their respective sides, *ad filum medium aquae.* The Supreme Court, therefore, entirely ignore the fact of navigability or unnavigability, in the solution of the question, and place their decision upon the sole ground whether the waters of the stream be salt or fresh. If the water of the stream or lake be fresh, however so large it be, and how extensively so ever it be used

by the public for the purposes of navigation, it is a private stream; and the principles of the common law, enunciated by Lord HALE as applicable to the private fresh water streams of the island of Great Britain, are to be adopted and applied to the rivers and lakes of this country. With great respect for the high source from which this decision emanated, I think it cannot be sustained, either on principle or authority. In this opinion, the learned chief justice deems himself compelled to follow what he considers the rule of the common law, because he can find no trace of any judicial decision which would authorize its rejection, or any legislative declaration or provision leading to such a conclusion. If the attention of the court had been called to the act of 1786, authorizing the grant of the lands under water of the navigable rivers of this State; to the act of 1792, granting the beds of the Mohawk and Hudson rivers to the Inland Lock Navigation Companies, and to the act of 1815, authorizing the commissioners of the land office to make grants of the lands under the waters of the lakes of this State, it would have been seen that the legislature had, in the most solemn manner, repudiated the doctrine enunciated, and had set up and claimed title in the people of this State to the lands under water of all the navigable rivers of the State, and of the lakes therein, and particularly to the *alveus* or bed of the two rivers mentioned. This claim of ownership entirely ignores the distinction, or criterion, supposed to be embraced in the common law rule, that the flux and reflux of the tide has anything to do with determining the character of the river; that if the water is fresh, then private, and the bed belongs to the adjoining owners, *ad medium filum aquae;* but if the water be salt, then the character of the stream is changed, and it is then public, and the soil thereof does not belong to the adjacent owners, nay, even that the same stream may partake of both characters, public as far as salt water extends up the same, and private when the water becomes fresh. That doctrine was certainly repudiated by the same court in *Palmer* v. *Mulligan (supra),* where the head note to the case says, *ut semble,* the Hudson is a public river above tide water. And it is to be particularly noted,

that the grant of the bed of the Hudson river, by the act of 1792, was above tide water. It seems to me very clear, therefore, that the learned Supreme Court would not have fallen into the view enunciated in *Hooker* v. *Cummings* (*supra*), that the character of the water, whether fresh or salt, determined the ownership of the *alveus* or bed of the stream or body of water, if their attention had been called to these legislative declarations, repudiating emphatically the supposed common law doctrine, and the long continued practice of the State in making the grants authorized.

It is apparent that *Hooker* v. *Cummings* was decided mainly on the authority of *Adams* v. *Pease* (2 Conn., 481). In this case SWIFT, Ch. J., states correctly what I understand to be the rule of the common law, namely, in the sea, in navigable rivers, and in navigable arms of the sea, the right of fishing is common to all. In rivers not navigable, the adjoining proprietors have the exclusive right. He then proceeds to say that rivers are considered navigable so far only as the sea flows and reflows, and upon this principle that case was decided. It was held that the Connecticut river, although in fact navigable a great distance above the flow and ebb of the tide, was not navigable after reaching the extreme point of the flow of the tide. If such be the common law, it seems to me that that part of it was not adopted in this State. As was said in *Lowber* v. *Wells* (13 How., 456), rules which reason and convenience may have dictated in reference to such streams as the Thames and Avon, and to an island like Great Britain, may be wholly inapplicable to the Mississippi, the Ohio, and the Hudson, and to a continent like America. "Our ancestors, in transferring themselves from the island of Great Britain, transferred with their persons only such parts of its common law as were applicable to their new abode. They did not adopt the whole system, nor was it imposed upon them in gross. Of this we have the highest evidence in the language of their first Constitution as a State. The language of the article of the Constitution being 'such parts of the common law of England, &c., as together did form the law of the said colony on the

19th of April, 1775.' Certain parts only, it is thus admitted, formed the law of the colony, and those, and those only, rejecting all others, were to be and continue the law of this State."

Our knowledge of the geography and physical conformation of the island of Great Britain enables us to see that a writer might readily fall into the supposition that, necessarily, the tide would ebb and flow in all of its navigable waters. Navigation is defined to be the act of passing on water in ships or other vessels. (Webster.) It would be difficult to conceive, in the days of Sir Mathew Hale, the practicability of passing over any of the waters of Great Britain, in ships or other vessels, not influenced by the tides or subject to their ebb and flow. Our own great rivers and lakes, which float on their waters thousands of vessels, propelled by steam or wind, are entirely fresh water, and the tides of the ocean have never disturbed their purity. The Missouri river is navigable for 3,000 miles from its mouth, with vessels, and its junction with the Mississippi more than 1,000 miles from tide water, and yet, if we adhere to Sir Mathew Hale's definition literally, we must hold it to be a fresh private river, and that its *alveus* or bed is owned by the adjacent owners. This statement shows the inapplicability of the doctrine contended for, to our condition and circumstances. It has been shown that at an early day it was emphatically repudiated by the legislature of this State.

But to resume the history of the decisions in this State. The next case in point of time is that of *Ex parte Jennings* (6 Cowen, 518). The canal appraisers had refused to award damages to the owners of the lands bordering on the Chittenango creek, the waters of which were taken into the Erie canal for a feeder. Jennings claimed to be the owner of the bed of the creek, and, consequently, of its waters, and the Supreme Court held that the Chittenango was not a navigable river, because the tide did not ebb and flow therein, and that consequently the proprietor of the adjacent land had the right to use the land and water of the river in any way not inconsistent with the public right of passage over it. The court said, an opposite rule prevails in the construction of grants,

bounded on the margin of navigable rivers. By the term navigable river, the law does not mean such as are navigable in common parlance. The smallest creek may be so to a certain extent, as well as the largest river, without being legally a navigable stream. The term has in law a technical meaning, and applies to all streams, rivers, or arms of the sea, where the tide ebbs and flows. A public grant, bounded on the margin of such waters, extends by construction no farther than high water mark, and leaves as to the rest an absolute proprietary interest in the public. Above the flow of the tide the river becomes private, either absolutely so or subject to the public right of way, accordingly as it is a small or large stream. At the same time, the same court granted a mandamus in the case of *Ex parte Tibbetts.* This latter case was taken to the Court of Errors, and is reported in 5th Wend., 423. Nothing was definitely decided in that court, at that time, as the case was disposed of wholly on the ground that the relator had failed to show title to the premises injured. Chancellor WALWORTH and Senator ALLEN maintained, how-. ever, that the rule of the common law prevails here; that grants of land bounded on rivers and streams, *above tide water*, extend *usque filum aquae*, and that not only the banks but the beds of the rivers, and the islands therein, and the exclusive right of fishing, pass to the grantee, unless expressly reserved. Chancellor WALWORTH also held that the principle of the common law extending grants *usque filum aquae*, is not sufficiently broad to embrace our large fresh water lakes; as to these our local law assigns the shores down to the ordinary low water mark to the riparian owners, and the beds of the lakes, with the islands therein, to the public.

Senator BEARDSLEY held that the rule of the common law extending grants, on the shores of rivers above the flow and reflow of the tide, *usque filum aquae*, does not apply to our large fresh water rivers; at all events, a patent bounded on a river navigable above tide water passes no interest to the patentee in the bed of the river as against the State. In his opinion he very pertinently observes: " Rules of law should be adapted not only to the moral, but the physical condition

of the country. Had the common law originated on this continent, we should never have heard of the 'doctrine that fresh water rivers are not navigable above the flow of the tide; nor would our courts have been called upon to compromise the interests of the community by sacrificing truth to technicality and substance to form." In 1835, the case of *Varick* v. *Smith* (5 Paige, 137) was decided by Vice-Chancellor Williams, and he said we may consider it as settled in this State that grants of lands, bounded on rivers and streams above tide water, extend *usque ad filum aquae*, and if the stream is, in point of fact, navigable for boats or other craft, the public have a right of passage or an easement, and nothing more; and the owner of the adjoining land, or the land bounded on the bank or margin of the stream, has a right to use the land and the water of the stream in any way not inconsistent with the easement due to the public. The *Case of Tibbetts* was again before the Court of Errors, and is reported in 17 Wend., 571. The head note, which, it is claimed, expresses all the court actually decided, is in these words: "If, in the improvement of the navigation of a public river, the waters of a tributary stream are so much raised as to destroy a valuable mill site, situate thereon, and the stream be generally navigable, although not so at the particular locality of the mill site, the owner is not entitled to damages within the provision of the canal laws, directing compensation to be made for private property taken for public use." The chancellor, who was for affirming the judgment of the Supreme Court, which awarded damages to the relator for the destruction of his mill site, held that, according to the common law, grants, embracing within their bounds rivers and the streams above tide water, convey not only the banks, but the beds of the rivers and streams, and the islands therein, unless expressly reserved, or the terms of the grants show an intention to exclude them. The right of the grantee, however, to the rivers or streams above tide water, if they be navigable, is not absolute, but subject to the right of the public to use the same as a public highway. Under this modification the common law rule, as he understood it, should

be applied to the largest rivers within the boundaries of the State. And he concedes that this common law rule does not apply to large navigable lakes, nor to rivers constituting the boundaries between this State and other States.

Senator BEARDSLEY, who delivered an opinion for reversing the judgment of the Supreme Court, held that the common law rule, which authorizes the owners of shores of rivers, in which the tide does not ebb or flow, to hold *ad filum aquae*, is not applicable to the condition of this State in respect to its large navigable rivers, in which no tide ebbs or flows; that from the acts of the government of New York, as well before as since the revolution, in asserting the title of the public to islands and the beds of rivers after granting the lands upon the shores of navigable rivers, in which the tide does not ebb or flow, a strong presumption is raised that the common law in this respect has never been adopted here. That in respect to the Mohawk river in particular, there has been a uniform claim of right on the part of the government, and a corresponding practice for upwards of one hundred years, to dispose of the bed of the river and the islands in the same, notwithstanding previous grants of the shores; that the bed of that river belongs to the State, and such parts thereof, as are unoccupied, may be used in the construction and improvement of the public canals without liability on the part of the State to pay damages for such appropriation. That when lands in this State are granted by letters patent, bounded on navigable fresh water rivers, and nothing appears from the terms of the grant that the government intended to part with the beds of the rivers, the patentees cannot take to the exclusion of the State, if the waters or beds of the rivers are wanted for public uses. That in the construction of grants of lands bounded on small and unnavigable streams, the owner of the banks takes *ad filum aquae*, as decided in *Ex parte Jennings*" (*supra*).

Senator TRACY, who delivered the other opinion for reversal, held that the great fresh water streams of this country are not subject to the principle of individual appropriation allowed by the common law of England. That the common

law doctrine that fresh rivers of what kind soever do of common right belong to the owners of the soil adjacent, is not of universal application in this State. That the reason of the rules assigning proprietorship of the bed of a river to the owners of the adjacent shores, wholly fails in reference to the large navigable rivers of this country. That the long continued practice in this State of granting islands in rivers subsequent to patents covering the adjacent shores, contradicts the assumed application of the common law rule of riparian ownership as applied to the great rivers of this State. That the Mohawk river, having immemorially been used for the purposes of navigation, is a public river, and the riparian owner is not entitled to recover damages for the destruction of a mill site in consequence of the waters thereof being raised by the erection of a dam for the improvement of the navigation of the Hudson river, into which the Mohawk flows. The judgment of reversal by the Court of Errors must be assumed to have been for the reasons assigned by the senators, where they accord, and such has been the generally received opinion of the profession, and such are the views of the learned justice of the Supreme Court, who delivered the opinion now under review. It is not to be denied that this position has been conceded, and by the able and learned vice-chancellor of the fifth circuit, in the case now to be referred to, although in that case he denied the law to be as then held. In the case of *Varick* v. *Smith* (9 Paige, 547), the vice-chancellor of the fifth circuit was of the opinion that the construction of the term navigable river had long been well settled, and, when applied to a river, it meant a river where the tide ebbed and flowed, and by the principles of the common law the bed of such a stream belonged to the State. He was also of opinion that the law, as laid down in the *Case of Tibbetts* (*supra*) in 17 Wend., was restricted to and applicable only to the Mohawk river.

The next case worthy of attention is that of *Starr* v. *Child* (20 Wend., 149). It was an action of ejectment, and the question was whether the grant of a piece of land on the Genesee river, extending to the river, then along the shore of said

river, included the stream and the waters thereof *ad usque filum aquae.*

It was conceded that the Genesee river was a fresh water stream, and a navigable river. Judge COWEN, in the opinion of the court, reiterates the doctrine advanced by him in the note to the case in 6 Cowen, that in all grants bounded on fresh water rivers, the soil thereof passes, unless expressly excluded by the terms of the grant. Judge BRONSON, in his dissenting opinion, controverts this doctrine, and as his views are so clearly, concisely and accurately expressed, they are extracted as fully and correctly stating the results which my examinations and reflections have led to. He says: "Navigable rivers belong to the public; other streams may be owned by individuals. This doctrine is founded on principles of public policy, so obviously just and wise, that it is no matter of astonishment to find it prevailing over all Europe, and, so far as I know, all over the civilized world. Indeed, it would be strange if any enlightened people had failed to perceive the importance of declaring all navigable waters public property. In England, a rule of evidence has been adopted, which, although it recognizes the doctrine, does not always give it complete practical effect. By the common law, the flow and reflow of the tide is the criterion for determining what rivers are public. This rule is open to the double objection, that it includes some streams which are not, in fact, navigable, and which consequently might well be the subject of individual ownership; and it excludes other streams which are, in fact, navigable, and which in every well regulated State should belong to the public. Although the ebb and flow of the tide furnishes an imperfect standard for determining what rivers are navigable, it nevertheless approximates the truth, and may answer very well in the island of Great Britain, for which the rule was made. But such a standard is quite wide of the mark when applied to the great fresh water rivers of this continent; and would never have been thought of here, if we had not found the rule ready made to our hands. Now I think no doctrine better settled than that such portions of the law of England as are not adapted to our condition, form

no part of the law of this State. This exception includes not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a law when that reason utterly fails, *cessante ratione legis, cessat ipsa lex.*" The attempt would be futile to add anything to the force or appositeness of these suggestions. Much stress is laid upon the case of the *Commissioners of the Canal Fund* v. *Kempshall* (26 Wend., 404), as recognizing as the law of this State the common law rule, that in its sense there are no navigable rivers unless the waters are subject to tidal influences, and learned judges, as we have seen, have supposed this case has overruled the principles understood to be settled by the *Case of Tibbetts*, in 17 Wend.

The only reported opinion in the latter case, is that by Senator VERPLANK. The proceeding was to recover damages for the interruption, by the agents of the State, of the water of the Genesee river, which supplied the defendant's mills on its bank. Such interruptions were caused by the erection, by the State, of an aqueduct across that river, and the defendant's mills were provided with water from a raceway, supplied with water by means of a dam across the Genesee river, at the distance of thirty or forty rods above the aqueduct. About four rods below the dam commences a fall of fourteen to fifteen feet, followed by a succession of rapids extending 150 rods to a fall of 96 feet, which distance is never navigable, except that logs were occasionally floated to a saw-mill. From the last mentioned fall, there is a succession of rapids and falls for the distance of about three miles, below which the river is navigable for several miles to Lake Ontario. It is also navigable, and has been used for the navigation of boats and river craft, above the dam for the distance of upwards of forty miles.

Senator VERPLANK, in his opinion, states the rule of the common law, as he understands it, to be that as to all fresh water rivers above the tide, they are presumed to be private

property, and in the absence of proof of any other right, the title thereof is always held to be in the owners of the banks, who are considered the grantees of the soil of the river beds, and of the use of the waters to the middle of the stream. Such property in small and wholly unnavigable rivers is strictly private and exclusive. He then proceeds to enforce these views at considerable length, and regards the main question as still open, notwithstanding the decision of the same court in the *Tibbetts Case.* That he could not regard that decision as an authority beyond the peculiar case of the Mohawk river. As to that river he concedes it to be an authoritative decision, and settling a contrary doctrine. But the learned senator then proceeds to show that the defendant had a grant from the State of the *alveus* or bed of the river, and was therefore the owner of the waters flowing in the stream. He says, "Here, I conceive, is the evidence of a positive grant, such as would have conveyed a fee in the bed of the Hudson at Poughkeepsie, and a property in the use of its waters there, subject only to the uses of commerce and navigation." Now it is well known that the Hudson, at the point mentioned, is a navigable stream, in which the tide ebbs and flows, and to which the common law, as understood by the learned senator, was inapplicable. This point was entirely sufficient to procure an affirmance of the judgment of the Supreme Court in favor of the relator, and there is no evidence in the report of the case that a majority of the court did not affirm the judgment on that point without attacking or weakening the doctrine of the court in 17 Wend.; and at the conclusion of the opinion it is said, "The view I have before taken of the proprietary interests of the defendant in the Genesee river is sufficient, if correct, for all the purposes of this case." I cannot but consider, therefore, that the learned chancellor, in his opinion in *Starr* v. *Child* (4 Hill, 369), fell into an error in supposing that whatever doubts the case of *The People* v. *Tibbetts* (17 Wend.) had thrown on the doctrine of the common law, as maintained by the chancellor, had been probably removed by the then recent decision of the Court of Errors in the *Case of Kempshall*

(*supra*), in which he says, "The judgment of the Supreme Court in favor of the riparian proprietor was unanimously sustained." True, it is, the rights of the riparian proprietor were sustained, but not on the ground of the common law rules as to the construction of conveyances of lands bounded by or upon a river or stream above tide water. The only reported opinion states distinctly that these rights could be maintained on another ground, namely, that the defendant had a grant from the State of the bed of the river. BRADISH, president of the senate, delivered the only opinion for reversal, and in it he says, that this case does not embrace the question as to the applicability of the common law of England to the navigable rivers of this State, so fully discussed in the opinions of Judges COWEN and BRONSON, "For in whatever way that interesting and important question, which I consider still an open one in this State, may finally be decided whether the proprietary interests in the beds of our navigable rivers and lakes, not tide waters, shall be decided to be in the people collectively, or in the riparian owner, it is conceded by all that this right may be acquired by private individuals under express grant, or claimed by prescription." And the court being of the opinion that the plaintiff in error was still the owner of the bed of the river opposite to the lands granted to Starr, from the shore to the thread of the stream, and as the latter constituted the subject in controversy, the defendant in error had shown no title nor any right of recovery. The judgment of the Supreme Court was therefore reversed. The learned author on water courses (Angell on Water Courses, § 546) has been misled by the remark of the chancellor, in the case of *Child* v. *Starr*, as to the extent of the decision of the court in the *Case of Kempshall*. The learned author alluded to says in this section that the courts in some of the States have adjudged that the common law, so far as it recognizes the distinction that the rights of property in navigable streams is governed by the circumstance whether the tide ebbs and flows therein, do not recognize this distinction as applicable to our large fresh water rivers, and that these rivers, without reference to the flow and ebb of the tide,

do not belong to the owners of the land adjacent, and that they have not the property in the soil under the water and the consequent exclusive right of fishing *usque ad filum aquae*, or to the middle of the river; or, in other words, those rivers are to be deemed not merely "highways" but "navigable." He then proceeds to discuss the various decisions in this State already adverted to, and then adds, "But all of doubt or uncertainty upon the subject in New York, if any remained, were removed by the decision of the Court of Errors in the *Case of Kempshall* (*supra*), in which the judgment of the Supreme Court, in favor of the riparian owners, was unanimously affirmed." It is submitted, with entire confidence, that nothing was decided in *Kempshall's Case* bearing on the question under consideration, and that no point therein ruled impaired or weakened the force of the *Case of Tibbetts* in 17 Wend. But it is believed that the principle of this case has received the sanction of this court on at least two occasions, and that we ought now to consider the law as settled in this State, in conformity with the opinions in that case. In *Furman* v. *The City of New York* (5 Sandf., 33), the Superior Court of New York said: "It is, however, well settled, we think, that by the common law the king is seized in fee of all the lands under the navigable waters of his realm, and entitled to grant and convey them. He has the property *tam aquae quam soli*, and in all profits in the sea, and in all navigable rivers. So the property of the soil *in all rivers*, which have the flux and reflux of the sea, belongs to the king and not to the lord of the manor adjoining, without grant or prescription. But by grant or prescription, a subject may have the interest in the water and soil of navigable rivers, as the city of London has the soil and the property of the river Thames by grants." These definitions are stated with great accuracy and correctness, and are the results derivable from a careful consideration of all the authorities. In all navigable rivers, and in the sea, the king has the property in the soil and in the water, and so he has in all other rivers which have the flux and reflux of the sea. And it follows, conclusively, that private ownership, except by grant or

prescription, can extend only to fresh water rivers not navigable. These conclusions reconcile, as far as it is practicable to do so, the various authorities, and establish principles which can be properly applied to the condition of things in this country, and adapting to our physical condition the rules of the common law, so far as the same may be. This case was affirmed in this court (5 Seld., 567), but no decision was had upon this precise point.

In the case of *The People* v. *Tibbetts* (19 N. Y., 523), this proposition is distinctly announced, that it is beyond dispute that the State is the absolute owner of the navigable rivers within its borders, and that as such it can dispose of them to the exclusion of the riparian owners. There is no qualification here that a river, to be navigable, must be composed exclusively of salt water from its terminus to its source, or that its character is changed as soon as the water therein changes from salt to fresh. This embraces a review of the cases decided in this State which have fallen under my observation, bearing upon this question, and the results to be deduced from them have already been stated. It is undeniable that a different rule has obtained in other States. In Massachusetts, in the case of *The Commonwealth* v. *Chapin* (5 Pick., 199), the Supreme Court held the Connecticut river not navigable, within the meaning of the term navigable, as understood by the common law. Rivers are considered navigable where the tide ebbs and flows, and not navigable above that point, and this the court regards as the law of England, New York, Connecticut, and of that commonwealth, citing several authorities already commented on. The Supreme Court of New Hampshire, in *Scott* v. *Wilson* (3 N. H., 321), held that the Connecticut river could not, by the rules of the common law, be considered as navigable in that State above the ebb and flow of the sea, but that it had been so long used by the public for boating and rafting that it must now be considered as a public highway. The Supreme Court of that State, in a previous case (*Claremont* v. *Carlton*, 2 N. H., 369), had held that when lands are described in a deed as bounded on a river, the center of the stream is to be considered as the

boundary. It was not stated in that case whether the river was navigable or not, but it seems to have been decided upon the authority of HALE, that fresh water rivers, of what kind soever, do of common right belong to the owners of the soil adjacent, each taking unto the *filum aquae* on their side. In the case of *The State* v. *Gilmanton* (9 N. H., 461), the court, after adverting to the rules laid down in the case last referred to, says: "But in relation to grants bounding on ponds, lakes or other large bodies of standing fresh water, that principle does not apply, but the grant extends only to the water's edge."

Judge DAGGETT, in the case of *Chapman* v. *Kimball* (9 Conn., 38), states the common law, as I understand it to be, when he says, the doctrine of the common law is that the right to the soil, of the proprietors of land on navigable rivers, extends only to high water mark; all below is *publici juris*, in the king, in England. That is the law in Connecticut. A distinction, he adds, is always maintained between rivers navigable and those not navigable; of the former the public alone has the right; of the latter individuals may and generally do own the same right as over other real estate. When a river, of this latter description, passes between two individuals, bounded respectively on the river, they own the soil respectively to the center of the river; when bounded on a navigable river, they own the soil respectively to high water mark and no farther. *Hayes* v. *Bowman* (1 Rand., 417, Virg. Rep.) decided that where land is bounded upon a stream not navigable, the conveyance carries with it the title to the middle of the stream. And the same doctrine is affirmed in *Mead* v. *Haynes* (3 Rand., 33). An act of the legislature of that State, passed in 1792 (ch. 86, § 6), prohibits the granting of the bed of any stream navigable, and used in commerce. In *Gavit* v. *Chambers* (3 Ohio, 495), the Supreme Court of that State held that the rules of the common law and common sense were, that he who owns the lands upon both banks of a river owns the entire river, subject only to the easement of navigation, and he who owns land upon one bank only, owns to the middle of the river, subject to the same easement, citing as authority the cases from this State, and the one in

2 Conn., already adverted to. The same rule was held applicable to a stream not navigable (*Benner* v. *Plattee*, 6 Ohio, 504), and the doctrine was reaffirmed in *Land* v. *Ricketts* (11 Ohio, 311), and also in *Walker* v. *Board of Public Works* (16 Ohio, 540). These cases in Ohio make no discrimination as to rivers affected by the flow and ebb of the tide, but, in fact, hold that there is no difference in the ownership of the bed of the river, between navigable and unnavigable rivers. In Angell on Water Courses, the case of *Cox* v. *The State* (3 Black., 193) is cited as authority for the doctrine that navigable streams or rivers, in the common law sense, are those only in which the tide ebbs and flows. A careful examination of that case will show that it does not warrant such a construction. In the opinion of the court, it is said that it had been contended that the owner of the banks of the river is, by the common law, the owner of the river, and has a right to occupy and use it, in any manner he pleases, for his own benefit. In support of this position, the court was referred to Hale's treatise, *De Jure Maris*, and to the case of *The People* v. *Platt* (*supra*). The court say: "We have carefully examined these authorities, and think they do not establish the principle contended for. The case against Platt is not, as to matter of fact, in point. In that case the river had been surveyed and sold as land; there was no reservation or deduction of the bed of the stream; the whole was computed as land, and sold as so many acres; the lines of the survey crossed the river, and the government patent covered the whole survey, including the river. The stream, in every sense of the word, was private property, not only in proprietary and ownership, but also in use, not a common passage for the public."

It will be seen that the Supreme Court of Indiana take the same views of this *Case of Platt* that have been already stated in this opinion; and they are now again dwelt upon, as this case has mainly given rise, and been the authority referred to in nearly all the cases, for the position, that navigable streams or rivers are only such as have the flow and ebb of the tide. The Supreme Court of Indiana then proceed to discuss the

rules of the common law as laid down by Hale in his treatise, and then say: "The doctrines of the civil law were more uniform, and the rights of all riparian proprietors were the same, as it respected the ownership of navigable streams. There was no difference made between those navigable streams where the tide did not ebb and flow, and those where it did. The exclusive right of the owner of the bank extended only to high water mark; and the bank below high water mark, and the whole bed of the stream, belonged exclusively to the public, and no obstruction or diversion of the water was permitted. The principles of the common law have been recognized in eight or ten of the States, but in several others the principles of the civil law, to a very considerable extent, have been adopted. In this State, neither the principles of the common or civil law have as yet received any judicial sanction."

These are all the cases referred to by Angell on Water Courses, as authority for the statement that this rule of the common law, namely, that rivers are navigable only when the tide ebbs and flows therein, has been recognized as law in the States of New York, Massachusetts, Connecticut, Maine, Maryland, Virginia, Ohio, and Indiana. It was especially disclaimed in the latter case, the only one cited by him, *Cox* v. *The State* (*supra*). The learned commentator on American law (3 Kent, 548, in a note), says this subject was learnedly discussed in the case of *Middleton* v. *Pritchard* (3 Scam., 510), where it was justly held, that at common law the title of the riparian proprietor, bounded by a navigable stream, extended only to high water mark; and in streams not navigable, the right of the riparian proprietor extended to the middle thread of the current. That arms of the sea, and streams where the tide ebbs and flows, are by the common law deemed navigable; and streams above tide water, though navigable in fact, are not deemed navigable in law. It was further declared in this case, that the Mississippi river was not a navigable stream at common law, and the title of the riparian proprietor extended to the middle thread of the stream, including islands, &c. The same question, as to the rights of the riparian owner in the Mississippi, was, it is said, very

learnedly discussed in *Morgan* v. *Reading* (3 Sm. & Marsh., 336), and the same doctrine and law declared; that the common law, and not the civil law, governed the case, and the magnitude of the river did not affect it; that the Mississippi river above the ebb and flow of the tide was not navigable in the sense of the common law, and the right of the riparian owner went to the middle of the river, subject, of course, to a right of passage in the public. Chancellor Kent says: "These decisions in the courts of Illinois and Mississippi are highly creditable to their learning and firmness, and it is consoling to meet with such frank and manly support of the binding force of the common law, on which American jurisprudence essentially rests."

It is appropriate here to consider the cases in this country, where the common law rule, as understood by many judges, has been repudiated, and the rule of the civil law recognized as more appropriate to the condition of this country. A leading and well considered case is that of *Carson* v. *Blazee* (2 Binney, 475). In that case, the question was whether a patent bounded by the Susquehanna river conveyed to the grantee the title to the center or the thread of the stream. Chief Justice Tilghman, in his charge to the jury, said, the common law principle is, in fact, that the owners of the banks have no right to the water of navigable rivers. Now, the Susquehanna is a navigable river, and therefore the owners of its banks have no such right. It is said, however, that some of the cases assert that by navigable rivers are meant rivers in which there is a flow and reflow of the tide. This definition may be very proper in England, where there is no river of considerable importance as to navigation, which has not a flow of the tide, but it would be highly unreasonable when applied to our large rivers, such as the Ohio, Allegany, Delaware, Schuylkill, or Susquehanna and its branches. On a motion for a new trial on the ground of misdirection, Yeates, J., in delivering the opinion of the court, said, the qualities of fresh or salt water cannot, among us, determine whether a river shall be deemed navigable or not. Neither can the flux or reflux of the tides ascertain its character.

Pursuing such a rule would, in the first case, render the Delaware an unnavigable stream throughout the confines of the State, and in the second, would confine its navigable quality to its several courses south from Trenton. · The property of the land covered by the waters of the Susquehanna, remains in the commonwealth as other ungranted lands.

This doctrine underwent a very elaborate discussion in the case of *Shrunk* v. *The Schuylkill Navigation Company* (14 Serg. & Rawle, 71), and the unanimous opinion of the Supreme Court was, that the rivers of Pennsylvania are not subject to the common law rule, that all fresh water rivers in which the tide does not ebb and flow, belong to the owners of the soil adjacent, so that the owners of one side have of common right the property of the soil, and consequently the right of fishing *usque ad filum medium aquae*, and the owners of the other side the rights of soil and fishing *ad filum aquae* on the other side, and that he who owns both sides is the owner of the whole river, and has the exclusive right of fishing according to the extent of his shores. Chief Justice TILGHMAN very justly said, the great rivers of America are so different from those of England, that in the opinion of many, the same definition of a navigable river cannot properly be applied to both, and that court held the English distinction, that the character of navigability depended upon the quality of the water, fresh or salt, to be wholly inapplicable to the principal rivers of that State. That the only test was, whether the river was or not actually navigable. (See also *Bird* v. *Smith*, 8 Watts, 434; *Union Canal Company* v. *Landis*, 9 Watts, 228.) In *Cates* v. *Wadlington* (1 McCord), the Circuit Court of South Carolina held, after stating the rule of the common law, that in England no river is considered navigable except when the tide ebbs and flows, that that rule would not do in that State, where their rivers are navigable several hundred miles above the flowing of the tide. The Supreme Court of South Carolina have held that what is a "navigable" river in that State, does not depend upon the rule of the common law; but that waters which are sufficient in fact to afford a common passage for people in vessels, are to

be taken as "navigable." *Wilson* v. *Forbes* (2 Dev., N. C., 30.) In *Collins* v. *Benbury* (3 Ired., N. C., 277), one of the judges, in commenting upon the applicability of the common law rule to the navigable waters of that State, pronounced it inapplicable, and remarked that by the rule of the common law, Albemarle and Pimlico sounds, which are inland seas, would not be deemed "navigable" waters, and would be the subject of private property, but that, in fact, it made no difference whether there is or ever was any tide in Albemarle sound. (See also *Ingraham* v. *Threadgill*, 3 Dev., N. C., 59.) Angell, though manifestly inclining to adhere to the common law rule, and its applicability to this country, concedes that there is much force in the following reasoning of Judge TURLEY, of Tennessee, upon this subject, in delivering the opinion of the Supreme Court of that State: "All laws are or ought to be an adaptation of principles of action to the state and condition of a country, and to its moral and social position. There are many rules of action recognized in England as suitable, which it would be folly in the extreme, in countries differently located, to recognize as law; and, in our opinion, this distinction between rivers 'navigable' and 'not navigable,' causing it to depend upon the ebbing and flowing of the tide, is one of them. The insular position of Great Britain, the short courses of her rivers, and the well known fact that there are none of them navigable above tide water but for very small craft, well warrants the distinction there drawn by the common law. But very different is the situation of the continental powers of Europe, in this particular. Their streams are many of them large and long, and navigable to a great extent above tide water; and, accordingly, we find that the civil law, which regulates and governs those countries, has adopted a very different rule." (*Elder* v. *Bucrus*, 6 Humph., 366.)

I shall refer to but one additional case in the State courts. It is that of *McManus* v. *Carmichael* (2 Clarke's Cases in Law and Equity), decided in the Supreme Court of Iowa. It contains an able and exhaustive review of all the cases, and a learned discussion of the whole subject, and may be profit-

ably referred to by all who desire instruction on these points, and are anxious to reconcile the contradictory *dicta* and deci sions which the discussion of them has called forth. I quote at some length from Judge Woodward's opinion, for the reason that his remarks are most pertinent to the point to be decided in this case. He states three propositions, which he deems are established: First. Although the ebb and flow of the tide was, at common law, the most usual test of navigability, yet it was not necessarily the only one. Second. However the truth may be upon the above proposition, that test is not applicable to the Mississippi river. Third. The common consequences of navigability attach to the legal navigability of the Mississippi. After a full review and discussion of the authorities relating to the first point, he says: "However the truth may be upon the first proposition, the flow and reflow of the tide is not applicable to the Mississippi, as a test of its navigability. And, third, the common law consequences of navigability attach to the legal navigability of the Mississippi river. The arguments and authorities upon these two propositions being in a great measure identical, they must be considered together. The thought has been before suggested, that, as a real and virtual test, the tide is a merely arbitrary one, and is not supported by reason; since many waters where the tide flows are not in fact navigable, and many where it does not flow are so. It is navigability in fact which forms the foundation of navigability in law; and from the fact follows the appropriation to public use, and hence its publicity and legal navigability. It is true that this legality attaches to some waters which do not possess the requisite quality in fact; but this arises from their relation to the high seas and to admiralty, and from the difficulty of making an hundred exceptions. It is impossible to bring the mind to an approval, when we attempt to apply it to the rivers of this country, stretching up to three thousand miles in extent, flowing through or between numerous independent States, and bearing a commerce which competes with that of the oceans—a test which might be applicable to an island not so large as some two of our States, and to streams whose utmost length

was less than three hundred miles, and whose outlet and fountain, at the same time, could be within the same State jurisdiction. In England, or in Great Britain, the chief rivers are the Severn, Thames, Kent, Humber, and Mersey; the latter of which is about fifty, and the first about three hundred miles in length, and of this (the Severn) about one hundred miles consists of the British Channel. The world-renowned Thames has the diminutive proportions of two hundred miles; and of even these lengths, not the whole is navigable. Thus it will be seen that the chief rivers of good old England range in extent with our Connecticut, Merrimac, Hudson, Allegany, Monongahela, Cedar, Iowa, and Des Moines, and bear a proportion of one to twenty when compared with the greater rivers of this continent."

This doctrine received a careful consideration by Mr. Justice McLEAN, of the Supreme Court of the United States, in the case of *Bowman's Devisees* v. *Wathen* (2 McLean, 376). The controversy was in relation to the rights of the riparian owner upon the Ohio river. The learned judge said: "We apprehend that the common law doctrine as to the navigableness of streams can have no application in this country, and that the fact of navigableness does in no respect depend upon the ebb and flow of the tide. When a stream which is clearly not navigable forms the boundaries of proprietors on each side of it, under the common law each may claim to the middle of the stream. But this right cannot be exercised to the injury of other rights of the same nature. On navigable streams, the riparian rights cannot, we suppose, extend generally beyond high water mark."

The discussion of a cognate question, by Chief Justice TANEY, in the Supreme Court of the United States, in the *Case of the Genesee Chief* (12 How., 454), is instructive. It was contended in that case that the admiralty jurisdiction of the courts of the United States did not extend to the waters of Lake Ontario, as it was claimed that jurisdiction was limited to cases occurring upon waters within the ebb and flow of the tide. The chief justice said: "The only objection made to this jurisdiction is, that there is no tide in the

lakes or the waters connecting them, and it is said that the admiralty and maritime jurisdiction, as known and understood in England and this country, at the time the Constitution was adopted, was confined to the ebb and flow of the tide. Now there is certainly nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit. If it is a public navigable river, on which commerce is carried on between different States or nations, the reason for the jurisdiction is precisely the same; and if a distinction is made on that account, it is merely arbitrary, without any foundation in reason, and it, indeed, would seem to be inconsistent with it. In England, undoubtedly, the writers upon the subject, and the decisions in its courts of admiralty, always speak of the jurisdiction as confined to tide water. And this definition in England was a sound and reasonable one, because there was no navigable stream in the country beyond the ebb and flow of the tide, nor any place where a port could be established to carry on trade with a foreign nation, or where vessels could enter or depart with cargoes. In England, therefore, tide water and navigable water are synonymous terms; and tide water, with a few small and unimportant exceptions, meant nothing more than public rivers, as contradistinguished from private ones; and they took the ebb and flow of the tide as the test, because it was a convenient one, and more easily determined the character of the river. Hence the established doctrine in England, that the admiralty jurisdiction is confined to the ebb and flow of the tide. In other words, it is confined to public navigable rivers."

Here we have a clear and satisfactory explanation for the fact that in speaking of navigable rivers writers in England defined them as tidal streams; and the fact that in the old thirteen States the far greater part of the navigable waters were tide waters, affords a sufficient reason for adopting this definition in most of those States. But we now see clearly its inappropriateness to the state of things as now existing, and that what was regarded as the undoubted evidence of a

navigable river in England is not a test or essential to consti-
stute a river navigable in America.   This state of things led
the courts in the United States naturally to adopt the English
mode of defining a public river, and that definition, says
Judge TANEY, "having found its way into our courts, became
after a time the familiar mode of describing a public river,
and was repeated as cases occurred without particularly
examining whether it was universally as applicable in this
country as it was in England.   The description of a public
navigable river was substituted in the place of the thing
intended to be described, and under the natural influence of
precedents and established forms a definition originally correct
was adhered to and acted on, after it had ceased from a change
in circumstances to be a true description of public waters."

It was this adherence which led so many judges into the
error of holding that there could be no public navigable
rivers in this country unless subject to the flux and reflux of
the tide, and to the illogical and unsatisfactory result that a
river was part public and navigable and in part private and
unnavigable, while in fact both portions were equally navi-
gable, and to the naked eye no line of demarkation or change
could be discerned.   It was under the influence of these pre-
cedents that the Supreme Court of the United States, in the
*Case of the Thomas Jefferson* (10 Wheat., 428), fell into
the error of declaring that the admiralty jurisdiction of the
courts of the United States was limited to the ebb and flow
of the tide, and which was followed in the case of *The Steam-
boat Orleans* v. *Phœbus* (11 Peters, 175).   These cases and
that of *Waring* v. *Clarke* (5 How., 441) have much embar-
rassed that court, and the latter case showed the unreason-
ableness of giving such a construction as would measure the
jurisdiction of the court by the tide.   For, as Chief Justice
TANEY correctly says: "If such be the construction, then a
line drawn across the Mississippi would limit the jurisdiction
although there were ports of entry above it, and the water
as deep and navigable and the commerce as rich and exposed
to the same hazards and incidents as the commerce below.
The distinction would be purely artificial and arbitrary, as

well as unjust, and would make the Constitution of the United
States subject one part of a public river to the jurisdiction
of ·a court of the United States, and deny it to another part
equally public and but a few yards distant." "It is evi-
dent," says the chief justice, "that a definition that would
at this day limit public rivers in this country to tide water
rivers is utterly inadmissible. We have thousands of miles
of public navigable water, including lakes and rivers in which
there is no tide." The jurisdiction is made to depend upon
the navigable character of the water, and not upon the ebb
and flow of the tide, says the court, in construing the ninth
section of the judiciary act of 1789. The rule of the civil
law, as already observed, is well defined, of universal recog-
nition on the continent of Europe, and, we have clearly seen,
better adapted to the state of things on the continent of
America than that which arose from the condition of the
waters of the island of Great Britain. Bracton, b. 1, ch. 12,
§ 6, enunciates that rule in these words:*

BEST, J., in *Blundell* v. *Catterall* (5 Barn. & Ald., 268),
says of this passage from Bracton: "I admit that Bracton
agrees with the civil law, and, I must add, with the laws of
all civilized nations," and he also says that our books show
that this passage has been adopted into our law, and adds:
"Surely such a man is no mean authority for what the com-
mon law was at the time he wrote." But the authority of
Bracton, so far as it maintained the right of the public to use
the banks of navigable rivers or the shores of the seas, "*sicut
ipsius fluminis*," was overruled and denied in *Ball* v. *Her-
bert* (3 Term R., 261), and in *Blundell* v. *Catterall* (*supra*).

Navigable rivers, in the language of the civil law, are not
merely rivers in which the tide flows and reflows, but rivers

---

* "Publica vero sunt omnia flumina et portus. Ideoque jus piscundi omnibus
commune est inportu et influminibus. Riparium etiam usus publicus est de jure
gentium, sicut ipsius fluminis. Itaque naves ad eas applicari, funes arboribus
ibi natis religari, onus aliquid in iis riponere, cuivis liberum est sicuti in ipsum
fluvium navigari; sed proprietas carum est illorum quorum praediis adherunt,
et, eadem causa, arbores in eisdem natae eorundum sunt; et haec intelligenda
sunt, de fluminbus perennibus; quia temporalia possunt esse privata."

capable of being navigated, that is navigable in the common sense of the term.   In the words of the Digest, a navigable river is "*statio iturve navigio*," or, as Lord MANSFIELD observed, "*ex facto oritur jus.*"   The Code Napoleon defines, with precision, rivers navigable and those not navigable, and the soil of the former belongs to the nation, and that of the latter, and islands which may be formed therein, to the proprietors of the shore on that side where the island is formed. (Code, §§ 559–561.)

We have now ascertained the doctrine of the common law, and that of the civil law, upon the subject now under consideration, and have traced the same to their respective sources.   We have seen, in applying the principles of the common law to the waters of this continent, how great has been the embarrassment of courts and judges and text writers; how variant have been the conclusions reached by them, and how contradictory and unsatisfactory have been the reasons for the results arrived at.   We cannot fail to see that the doctrine of the civil law, as applicable to the navigable waters of this State, was early adopted by the legislature in the organization of a commission to make grants of land under the waters of the navigable rivers and lakes embraced within its teritory, and the continuous use of this power down to the present time, and in the grants of land under those waters made by the State itself.   It is certainly to be regretted that this doctrine, thus solemnly recognized by the legislative authority of the State, and which has received the sanction of some of the most learned and able judges of our country, should have been discredited by our courts, and its applicability to our waters denied.   This result was supposed inevitable by the adoption here of the common law, and with it the definition of navigable rivers, as the same was understood and applied in reference to those of the island of Great Britain.   It is believed that it has been shown from principle and authority, that such definitions were wholly inappropriate to our physical condition, and to the express policy of the State as indicated by its legislation.   We have examined carefully the judicial discussion of this doctrine,

culminating in the decision by the court of ultimate appeal in this State, repudiating its applicability to the rivers of this State, and establishing the better doctrine of the civil law. It certainly is not too strong an expression to say, that the decision of the Court of Errors in *Tibbetts' Case* was universally, among judges and the profession, regarded as settling the law, until the appearance of the decision of the same court in *Kempshall's Case* in 26 Wend. That I do not place an incorrect estimate upon this decision in 17 Wend., I quote a note of Chancellor KENT (3 Com., 549). He says: "In the case of *The Canal Appraisers* v. *The People* (17 Wend., 571), the judgment of the Supreme Court of New York, in 13 Wend., 355, was reversed, and the right of the State over waters above the flow of the sea, for all public purposes in derogation of individual rights, was declared. All rivers in fact navigable, were deemed public rivers, and subservient to public uses." It is true that the learned commentator considers this case to have been overruled in the subsequent *Case of Kempshall* in 26 Wend., but for the reasons already given, it is submitted with confidence that this is a misapprehension, and that the latter case might well have been decided without infringing the doctrine of *Tibbetts' Case* in 17 Wend., on the ground taken in the opinion, that there was evidence of a positive grant, such as would convey the fee of the bed of a navigable river where the tide ebbed and flowed. Such being the fact in that case, it, beyond all dispute, carried the case in favor of Kempshall, and rendered not only wholly unnecessary, but improper, any disturbance of the doctrine as settled and declared in the case in 17 Wend. I am compelled, therefore, to regard the principles there enunciated as the settled law of this State. And I have the less hesitation in so doing, as I believe that doctrine to be sound and impregnable, and in accordance with the expressed will of the legislature, and the early and uniform practice of the State, and the better decisions of the courts of this State, and of other States, and of the United States. The judgment of the Supreme Court should therefore be affirmed.

Judgment affirmed.