Froessel, J.
In this article 78 proceeding, instituted pursuant to section 1244 of the Public Health Law, the Town and the Village of Waterford, hereinafter called appellants, are challenging the right of the Water Pollution Control Board of this State, hereinafter called the Board, to classify the waters of that section of the Mohawk River Drainage Basin extending from its mouth to the first dam above Cohoes Falls as Class C waters.
Pursuant to a legislative mandate contained in subdivision 2 of section 1209 of the Public Health Law, the Board in 1950, after public hearings, adopted Classifications and Standards of Quality and Purity for the waters of the State (N. Y. Legis. Doc., 1951, No. 69, pp. 76-78; N. Y. Off. Comp, of Codes, Rules & Regulations, 6th Off. Supp., p. 208 et seq.). The system provides seven classes for fresh surface waters according, in essence, to the highest and best use to which the water may be put, and may be briefly summarized as follows:
AA and A: Drinking water (the only difference between the two being the type of treatment required to render the water fit to drink)
B: Bathing
C: Fishing
D: Agricultural or industrial water supply
E: Sewage or waste disposal and transportation
F: Sewage or waste disposal only, under such conditions as will not cause a public nuisance.
Classes AA to D require sewage treatment; classes E and F do not. This classification system, which appellant does not challenge, was one of the initial steps (after a survey) in implementing the comprehensive program of water pollution control envisaged by the Water Pollution Control Act (Public Health *176 Law, art. 12, §§ 1200-1263). The Act was enacted in 1949 (L. 1949, ch. 666) after three years of exhaustive studies and reports by a special legislative committee empowered to study the problem of water pollution throughout the State (N. Y. Legis. Docs. 1947, No. 59; 1948, No. 50; 1949, No. 51).
The broad policy underlying the Act is stated as a declaration of policy in section 1200:
“It is declared to be the public policy of the state of New York to maintain reasonable standards of purity of the waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of fish and wild life, including birds, mammals and other terrestrial and aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods to prevent and control the pollution of the waters of the state of New York.”
The purpose of the Act (§ 1201) is to safeguard the waters of the State by preventing new pollution and by abating existing pollution, and the Board, comprising the heads of five departments of the State Government, is given broad powers, duties and responsibilities in effecting these goals (§ 1208). Vested riparian rights are in no way involved. (See People ex rel. Loomis v. Canal Appraisers, 33 N. Y. 461.)
As already noted, the Board established a system of classification in 1950, and in implementing this system sections 1208 and 1209 envisaged a four-step procedure (N. Y. Legis. Doc., 1951, No. 69, pp. 73-74): (1) a survey of all the waters throughout the State; (2) the classification and assignment of appropriate quality standards to all such waters or segments thereof; (3) the development of comprehensive programs for the abatement of pollution which contravenes the. standards established for such waters, and (4) the execution of these programs through co-operative endeavors so far as possible, or, if necessary, through the issuance and enforcement of orders requiring abatement of pollution.
In the instant case we are concerned with step 2 of this procedure, whereby a section of the Mohawk River—not a “mountain rill”—bordering on the Town and the Village of *177 Waterford was classified as 0 water. As a result of such classification, appellants, who for a long period had been discharging sewage into the river without any kind of treatment, may be required to cease such practice and eventually to construct sewage treatment facilities. They contend on this appeal that the 0 classification should be set aside for four reasons, which we shall discuss separately.
Their first contention is that in assigning the 0 classification to the waters involved, the Board failed to comply with section 1209 of the Public Plealth Law in that it failed to give any consideration to the fiscal and economic aspects of its classification. Section 1209, which recognizes that “ no single standard of quality and purity of the waters is applicable to all waters of the state or to different segments of the same waters ”, provides that the classification of waters made by the Board “ shall be made in accordance with considerations of best usage in the interest of the public and with regard to the considerations mentioned in subdivision three hereof ” (emphasis supplied). Subdivision 3 reads as follows:
“In adopting the classification of waters and the standards of purity and quality above mentioned, consideration shall be given to:
(a) the size, depth, surface area covered, volume, direction and rate of flow, stream gradient and temperature of the water;
(b) the character of the district bordering said waters and its peculiar -suitability for the particular uses, and with a view to conserving the value of the same and encouraging the most appropriate use of lands bordering said waters, for residential, agricultural, industrial or recreational purposes;
(c) the uses which have been made, are being made or may be made, of said waters for transportation, domestic and industrial consumption, bathing, fishing and fish culture, fire prevention, the disposal of sewage, industrial waste and other wastes, or other uses within this state, and, at the discretion of the board, any such uses in another state on interstate waters flowing through or originating in this state;
*178 (d) the extent of present defilement or fouling of said waters which has already occurred or resulted from past discharges therein.”
Appellants insist that in deciding whether a particular classification is in the “ public interest ” and encourages “ the most appropriate use of lands bordering the waters for 1 residential ’ and 'industrial’ purposes”, the Board, in order to comply with the statute, must take into account the “ economic and fiscal ’ ’ impact of the classification upon the municipalities aifected. Appellants claim that if the C classification involved here is permitted to stand, they would be forced to levy a 150 per cent increase in taxes and be required to forego all other civic improvements for at least a generation”; this claim respondent denies. In other words, they maintain, as does Judge Van Voobhis, that in classifying the waters of this State to .prevent and control the pollution ” thereof' (Public Health Law, § 1200) the Board’s determination as to reasonable standards of purity” or impurity should depend not on the actual facts, but rather in some measure on how much it will cost to abate or prevent pollution. It is another way of saying that a physician may not diagnose a serious disease as such if the patient cannot afford the cost of cure.
The Appellate Division, in confirming the Board’s determination, held that “ problems of municipal financing were not among the considerations contemplated by paragraph (b) of subdivision 3 of section 1209,” and hence need not be considered by the Board in adopting a classification of particular waters. It found strong support for its position in the 1947, 1948 and 1949 reports of the Special Legislative Committee on Pollution Abatement, which led to the enactment of article 12 of the Public Health Law, and in section 1224 of the statute, which reads, in pertinent part, as follows:
“ * * * if, after public hearing, the board finds that it is impossible or impracticable for any person to comply with the standards, determinations or orders of the board as to treatment of sewage * * * because of financial inability (due to statutory restrictions on borrowing power or otherwise) to construct the necessary treatment works or provide other *179 adequate means of disposal, the hoard shall not order the abatement * * * during such period of time, not in excess of five years, as the board determines necessary in order to provide means for disposal or treatment of such sewage * * * so as to comply with such recommendations or such requirements. Extensions of time beyond the five-year or shorter period may be granted by the board after public hearing, if the person involved shows to the satisfaction of the board that he has diligently tried to comply with the orders Of the board.” (Emphasis supplied.)
Here, felt the court, was an express recognition in the statute itself of the fiscal problems involved in the abatement of water pollution and of the “ conflict between the factor of costs and the concept of public policy” which the Legislature “determined to enunciate ”.
We agree fully with the views expressed by the Appellate Division. There is nothing in the statute that requires the Board to consider probable costs or relative priorities as between municipal public works projects, at the time it adopts a classification for particular waters. Nowhere in section 1209, which sets out the criteria to govern a particular classification, is there any mention of financial costs, fiscal conditions or public works priorities. The statute does recognize, in section 1224, that financial disability might impede the construction of the facilities needed to comply with adopted classifications; the relief provided for, however, is not the annulment of the classification previously assigned but an extension of time in which to effect the needed improvements.
It is quite apparent that appellant is premature in seeking to raise fiscal considerations at the time of classification. At this stage, the Board is merely applying its over-all system of water classifications and quality standards to a particular body of water, in accordance with the 1 ‘ best usage ’ ’ of that water and in the light of hydrologic factors, the character of the surrounding district, the past, present and foreseeable uses of such waters and the extent of present pollution. The proper time to consider the financial ability of affected municipalities to comply with established standards is when the Board, in accordance with its previously assigned classifications, evolves *180 a comprehensive program to abate pollution in the classified waters. If at that time a municipality demonstrates that it is financially unable to provide the treatment works necessary to cure existing pollution, the Board is empowered to grant extensions of time.
Appellants contend that if the fiscal and economic aspects of water purification cannot properly be raised at the time of classification, then they can never influence a particular classification, since the municipality is legally bound to abide by the classification made, subject only to such deferment as the Board may allow. The obvious answer to this is that the Legislature well knew that a comprehensive water purification program would impose a financial burden upon the municipalities of the State, but determined, by enacting the Pollution Control Act, that the pressing need for water purification outweighed any financial hardships incident thereto.
One of the initial objectives of the Special Legislative Committee on Pollution Abatement, whose reports led to the enactment of the Act, was:
“ To study the problem of financing pollution abatement works, and the ability of municipalities and industries to construct and operate such projects.” (N. Y. Legis. Doc., 1947, No. 59, p. 15.)
Each of the reports of the committee devoted a separate section to the “ fiscal factors in pollution abatement ”, and manifested a growing concern over the fiscal limitations imposed by law on municipalities that would impede their ability to finance needed pollution abatement facilities. The life of the committee was extended for two years, after the enactment of the Act in 1949, and its “most important function” in 1950-51 “ centered around the solution of the fiscal problems ” (N. Y. Legis. Doc., 1951, No. 69, p. 35). The committee was instrumental in proposing and in having passed: (1) legislation providing for increased revenues from sewer rents, and (2) a constitutional amendment which allows municipalities to incur additional debt by permitting an advance exclusion of up to 75% from the constitutional debt limit, for self-liquidating pollution abatement projects, 'and which includes other provisions having “ a beneficial effect on the fiscal ability of munici *181 polities to finance needed sewer systems 'and seWage treatment plant” (id. p. 26, pp. 24-25). It is interesting to note that, in concluding their discussion of the fiscal problems in their 1951 report, the committee stated (p. 41):
“ The adoption of the proposed constitutional amendment relating to debt limits and of legislation to implement it, as well as the revision of present sewer rental provisions, may be expected to eliminate substantially all of the constitutional and legal barriers to the financing of pollution abatement.” (Emphasis supplied.)
This would tend to cast doubt on appellants’ claim of financial inability to construct and operate a sewage disposal plant, which is disputed by respondent, as well as like claims made by the Cities of Cohoes and Troy in their amici briefs. It may fairly be said that much of their difficulty is due to their failure in the past to provide needed sewage disposal facilities, as other communities have done.
It is true that the committee noted (at pp. 41-42) that economic difficulties might still be encountered if the cost of installations should prove disproportionately high, but it is significant to note that in discussing this possibility it stated:
‘ ‘ It will be necessary to study such situations individually, when and if they develop, taking into consideration the resources of the municipality, any unusual difficulties which increase the cost of installation, and the extent of sewage treatment required to meet the standards set up by the Pollution Control Board.”
It seems clear that the time contemplated for considering these factors was not when the Board assigned a classification to particular waters, but when they were evolving their program to prevent or abate pollution in the classified waters.
Although the only relief appellants seek, in reference to their first contention, is a remission to the Board to re-evaluate the classification in the light of probable costs, it is quite clear from their petition (par. 15th) and Schedule 7 annexed thereto, and from their briefs, that the proper classification of the waters in question would, in their opinion, have been Class E, entitling them to continue to discharge sewage into the Mohawk *182 River without treatment. The appellants seem to ignore completely the severe menace to public health posed by polluted waters, as well as the deleterious effects of pollution on neighboring waters and on the natural resources of the State, which were among the prime considerations that motivated the enact-men of the Act (see N. Y. Legis. Doc., 1947, No. 59, pp. 17-29). Furthermore, no section of the Mohawk River proper has been classified lower than C and, in fact, much of it has been classified as A and B. Of a total of 618 classifications of the waters of the Mohawk Drainage Basin, only three creeks were classified lower than D.
Appellants’ second contention is that the “ Appellate Division erred in holding that all questions of cost and fiscal consequences had been ‘ removed from the Board’s consideration ’ by the Legislature.” This is essentially the same argument as that just considered, and requires no further comment.
The third argument made by appellants, which they do not appear to have raised before the Appellate Division, is that
“ The statute delegates legislative power to the Board in violation of Article III, Section 1 of the State Constitution.”
This same question of constitutionality is involved in and disposed of in Matter of City of Utica v. Water Pollution Control Bd. (5 N Y 2d 164) decided herewith, and accordingly needs no further treatment here.
Appellant’s fourth and final contention is that the “ Board failed to hold a public hearing as required by law, failed to make any findings of fact to support its determination, and failed to accord the petitioners an opportunity to test by cross examination the evidence or reports considered by the Board in making its determination.” Subdivision 6 of section 1209 of the statute provides:
“ The adoption, alteration or modification of a classification of the waters of the state or the standards of quality and purity, above prescribed, shall be made by the board only after public hearing on due notice. ’ ’
Although subdivision 7 of section 1209 prescribes the contents of the required notice, nothing further is said as to the *183 form and conduct of the hearing. The public hearing held in the instant case was conducted upon notice, as required by the statute. Appellants claim they did not receive notice of the hearing until the morning it was held. Respondent denies this, and Exhibits 8 and 4 show proof of service of notice upon appellants. In any case, appellants requested and obtained three extensions of time, with leave to submit whatever material they desired in support of their position, giving them more than six months to do so after the scheduled hearing.
At the hearing, members of the Board’s staff first explained the background and purposes of the Act, the classification system adopted by the Board and the engineering data which it had assembled. The meeting was then opened for suggestions and criticisms, and representatives from some eight community organizations presented their views. Counsel to the Department of Health explained to the assembled group that if they preferred not to make oral suggestions, they could file any prepared statements they had with the Board that night or communicate with the Board by mail. The classifications adopted by the Board were promulgated over a year later.
Appellants argue that the statutory provision for a public hearing contemplated that witnesses be sworn, testimony taken, opportunity for cross-examination given and findings of fact made, though no such requests were made at the time. Respondent concedes that these procedures were not followed at the hearing, but justifies the hearing as actually conducted on the ground that it was acting in a quasi-legislative capacity and it was not required to follow those procedures ordinarily associated with a quasi-judicial type of hearing. Moreover, as the Appellate Division noted, appellants did not request an adjudication of an issue germane to the classification as it affected their area; they simply requested and obtained extensions of time to file a memorandum and did not request an additional hearing until after the Board’s determination had been made.
We think it clear that the hearing as conducted by the Board accorded with the type of hearing contemplated by the Legislature. As noted, subdivision 6 of section 1209 of the statute, while requiring a public hearing prior to the adoption of water classifications, does not prescribe the form or the manner in *184 which it is to be conducted. In contrast therewith, section 1208 (sulbd. 3, par. [b]), dealing with public hearings with respect to violations of the statutory provisions or of orders issued by the Board, authorizes the Board to
‘ ‘ hold public hearings, receive pertinent and relevant proof from any party in interest who appears before the board, compel the attendance of witnesses, make findings of fact and determinations, and assess such penalties therefor as are hereinafter prescribed ”.
By thus making specific provision for a quasi-judicial type of hearing with respect to violations of the statute or orders of the Board, in contrast with the general requirement of a public hearing in connection with adopting water classifications, the Legislature in effect distinguished between the different types of public hearings which the Board was required to hold, and impliedly sanctioned the informal type of hearing conducted here. A judicial type of hearing would, of course, be appropriate when punishing individual violations, while it would be manifestly inappropriate in connection with the adoption of a water classification affecting many municipalities, individuals and industries. (See Administrative Adjudication in New York, Benjamin, p. 6.)
The order appealed from should be affirmed, without costs.